STATE EDUCATION ASSISTANCE AUTHORITY v. BANK OF STATESVILLE

No. 44

(Filed 12 June 1970)

1. **Colleges and Universities;    Taxation § 7—    loans to college students — revenue bonds — public purpose**

   The issuance of revenue bonds by the State Education Assistance Authority pursuant to Chapter 1177, Session Laws of 1967, and the use of the proceeds therefrom by the Authority for the sole purpose of making loans to meritorious college and vocational students of slender means, thereby minimizing the number of qualified persons whose education or training is interrupted, *held* for a public purpose.

2. **Schools § 1;    Taxation § 7—    education of residents — public purpose**

   The education of residents of this State is a recognized object of State government; hence, provision therefor is for a public purpose. N. C. Constitution, Art. IX, §§ 1, 2, 3, 6, 7.

3. **Colleges and Universities—    higher education — duty of General Assembly**

   Subject to constitutional limitations, methods to facilitate and achieve the public purpose of providing for the education or training of residents of this State in institutions of higher education or post-secondary schools are for determination by the General Assembly.

4. **Colleges and Universities;    Taxation § 21—    college loan revenue bonds — exemption from State taxation — public purpose**

   The provisions of Chapter 1177, Session Laws of 1967, that exempt stu-

dent loan revenue bonds from taxation by the State or by any of its subdivisions do not contravene N. C. Constitution, Art. V, § 5, which provides that property belonging to the State or to municipal corporations shall be exempt from taxation, the enumerated properties in Art. V, § 5, not including bonds issued by the State or any State agency, since the tax-exempt provisions make possible a more favorable sale of the revenue bonds and thereby contribute substantially to the accomplishment of the public purpose for which they are issued.

**5. Colleges and Universities; Constitutional Law § 7— student loan program — delegation of legislative authority — sufficiency of loan standards**

Chapter 1177, Session Laws of 1967 (G.S. 116-209.1 et seq.), which authorizes the State Education Assistance Authority to issue revenue bonds and to use the proceeds therefrom for the making of loans to "residents of this State to enable them to obtain an education in an eligible institution," provides sufficient legislative standards whereby the Authority can determine to which students the loans should be made, where it is implicit in Chapter 1177 that all loans made from the bond proceeds shall be made in compliance with the standards of federal legislation which supplement the loan program of the Authority. N. C. Constitution Art. I, § 8 and Art. II, § 1.

**6. Colleges and Universities— student loan program — determination of recipients**

The only student loans that the Education Assistance Authority is authorized to make or purchase are student loans which qualify under the federal statutes for federal assistance in respect of interest subsidy and guaranty.

**7. Statutes § 4— construction as to constitutionality**

A statute will not be construed so as to raise a serious question as to its constitutionality if a different construction which will avoid the question of constitutionality is reasonable.

LAKE, J., dissenting.

APPEAL by defendant from *Bailey, J.,* at February 9, 1970 Civil Session of WAKE Superior Court, certified, pursuant to G.S. 7A-31, for review by the Supreme Court before determination by the Court of Appeals.

This action is for a declaratory judgment, G.S. 1-253 *et seq.,* determinative of the validity of $1,500,000.00 of Revenue Bonds, Series B, consisting of 1,500 bonds of $1,000.00 each, issued by the State Education Assistance Authority (Authority). North Carolina banks offered to purchase the entire issue of $1,500,000.00 at par and accrued interest. The offers included that of the Bank of Statesville for the purchase of three $1,000.00 bonds. The Bank of Statesville is ready, able and willing to accept and pay for these bonds if and when they are adjudged valid; otherwise, it refuses to do so.

The Authority was created and constituted "a political subdivision of the State" by Chapter 1180, Session Laws of 1965, referred to hereafter as the 1965 Act. (The provisions of the 1965 Act were designated G.S. 116-201 through G.S. 116-209). The 1965 Act provided: "The exercise by the Authority of the powers conferred by this Act shall be deemed and held to be the performance of an essential governmental function." G.S. 116-203.

Chapter 1177, Session Laws of 1967, referred to hereafter as Chapter 1177, amended the 1965 Act, "being G.S. 116-201 to 116-209 of the 1965 Cumulative Supplement," by adding at the end thereof sections designated G.S. 116-209.1 through G.S. 116-209.15. Chapter 1177 authorized the Authority to issue student loan revenue bonds in an aggregate principal amount outstanding at any time not exceeding $12,500,000.00.

The case was submitted to Judge Bailey on an agreed statement of facts which, in addition to matters set forth above, contained the provisions quoted (with immaterial deletions) below.

"3.   At the present time, a large number of North Carolina residents are, as students, pursuing educational courses beyond the public school level; that the educational facilities of the State and of private institutions in this State and throughout the country have been greatly enlarged and expanded to meet the needs for the education of a greater number of students seeking education beyond the level of the public school system; that to meet the cost of their education, many students are in need of money and are borrowing funds to pay for their education, generally upon terms which provide for repayment after the completion of their education; that sufficient loan funds are not available through the normal channels of commercial lending and financing to meet this need of North Carolina residents; nor are student loans attractive to commercial lenders because the students seeking loans usually are persons who are not fully in income producing situations, and furthermore, the commencement of repayment of principal is deferred; that without moneys which can be made available to needy students through the State's student loan program administered by the Authority, and financed through the issuance by the Authority of student loan revenue bonds, many of these North Carolina Students will not be able to complete their formal education, or pursue educational courses beyond the public school level.

"4.   . . .

"5.   That acting under and by virtue of the provisions of Chapter 1177 . . . the Authority has acquired and is purchasing stu-

dent loan obligations made pursuant to the Authority's commitments to purchase said obligations, said 'student loans' being those which have enabled North Carolina students to continue their education in 'eligible institutions' as these terms are defined in G.S. 116-209.2.

"6. Acting pursuant to said Chapter 1177, the Authority did on August 29, 1968, adopt a bond resolution (Exhibit A) providing for the issuance and sale of a series of bonds designated as Series 'A' Bonds in the total sum of $3,000,000.00, . . . that the Authority sold the Series 'A' Bonds to investors through its Fiscal Agent, Wachovia Bank & Trust Company, N.A., pursuant to a contract (Exhibit B) between the Authority, Wachovia Bank & Trust Company, N.C., and College Foundation, Inc., dated August 29, 1968, . . . under which Wachovia Bank & Trust Company, N.A., as Fiscal Agent, (hereinafter referred to as 'Fiscal Agent') undertook the duties of consummating the sale of the bonds to bidders whose proposals had been accepted by the Authority, disbursing of bond proceeds to purchase student loans, and administering of bond revenues for the Authority; and under which same contract, the Authority agreed to purchase and did purchase certain student loans of North Carolina residents from College Foundation, Inc., said loans having been made to enable North Carolina residents to pursue their education in 'eligible institutions'; and that College Foundation, Inc., agreed to sell and did sell certain student loan obligations to the Authority and agreed to administer the collection of these student loans for the Authority, and to remit the proceeds to the Authority's Fiscal Agent, Wachovia Bank & Trust Company, N.A., as is more fully set out in Exhibit B; that the $3,000,000.00 realized from the sale of its Series 'A' Bonds was fully expended by the Authority in accordance with the bond resolution during the school year 1968-1969.

"7. The Authority's Bond Resolution of August 29, 1968 (Exhibit A) in addition to providing for the initial issue, provided for additional series of bonds to be issued to an aggregate principal amount outstanding at any time not exceeding $12,500,000.00.

"8. For the school year 1969-1970, the Authority determined that additional loan funds, which would not otherwise be available were needed by North Carolina students, during this school year in at least the amount of $1,500,000.00; and upon making this determination and finding, the Authority then proceeded with the issuance of additional student loan revenue bonds.

"9. On the 21st day of August, 1969, at a meeting duly called and held in its offices in Raleigh, North Carolina, the Authority adopted a resolution (Exhibit C) . . . providing for the issuance

under authority of Chapter 1177 . . . and of its bond resolution of August 29, 1968 (Exhibit A), of a series of bonds, designated as its Series 'B' Revenue Bonds, in the total amount of $1,500,000.00, in units of One Thousand Dollars, to bear interest at the rate of five and one-half (5½%) percent; and it further, by resolution (Exhibit D), authorized execution of and there was duly executed a supplemental tripartite agreement (Exhibit E) with its Fiscal Agent, Wachovia Bank & Trust Company, N.A., and College Foundation, Inc., for sale and expenditure and administration of the bond proceeds . . . .

"10.  . . . .

"11.  . . . .

"12. The funds which were realized by the Authority from the sale of its Series 'B' Bonds have been used or are committed for use prior to the close of the academic year 1969-70 in purchasing loans made to 2,140 students, with the average loan being in the amount of approximately $700.00; that in addition to the loans which were made with these funds, 1,039 applications were rejected by College Foundation, Inc., of which number one-half would have received favorable action if sufficient additional loan funds had been available; that in addition to those loans made or loan applications rejected by College Foundation, Inc., a survey of the Authority, as to loan needs of North Carolina residents for the academic year 1969-1970, indicates that 2,069 students in 'eligible institutions,' as that term is defined in G.S. 116-209.2, expressed to these institutions a need for loans with which to continue their education.

"13.  . . . .

"14.  . . . .

"15. College Foundation, Inc., is a North Carolina nonprofit public educational service corporation organized and operating for the purpose of making loans to North Carolina students for education purposes and is an 'eligible lender' under the insured student loan program administered by State Education Assistance Authority, and as such has made over ninety (90%) percent of the loans which have qualified for this program; and the members of the said corporation by its certificate of incorporation are: The Governor of the State of North Carolina; the Chairman of the North Carolina Board of Higher Education; the Treasurer of the State of North Carolina; the Chairman of the Board of Conservation and Development of the State of North Carolina; the Chairman of the Board of Directors of the Business Development Corporation of North

Carolina, and the governing trustees of the corporation by its certificate of incorporation are appointed by the Governor of North Carolina."

In their agreed statement, the parties listed eleven legal questions on which they sought a judicial declaration or adjudication. Six relate to whether Chapter 1177 is violative of designated constitutional provisions. Five relate to whether "the operating procedures followed by the Authority" are violative of "the enabling legislation," *i.e.,* Chapter 1177.

The court answered each of the legal questions in favor of plaintiff. The judgment concludes as follows:

"IT IS, THEREFORE, upon motion of attorneys for the plaintiff, State Education Assistance Authority, ORDERED, ADJUDGED AND DECREED that the three Series 'B' Student Loan Revenue Bonds, being Bonds Nos. B-476, B-477 and B-478, hereinbefore referred to, have been duly and legally authorized and duly and legally sold to the Bank of Statesville, and that the said revenue bonds, when delivered in accordance with the agreement of the Authority and the Bank of Statesville, will be valid and binding obligations as revenue bonds of the Authority, in accordance with the tenor thereof, and that such bonds shall be exempt from all taxation within this State as provided by G.S. 116-209.13.

"IT IS FURTHER ORDERED, ADJUDGED AND DECREED that, upon delivery of the said bonds in accordance with the said agreement, the defendant, Bank of Statesville, shall accept and pay for the same in accordance with its agreement therefor which was made by said bank."

Defendant excepted and appealed. On appeal, defendant assigns as error the "signing and entering of the judgment."

*Attorney General Morgan, Deputy Attorney General McGalliard and Staff Attorney Blackburn for plaintiff appellee.*

*Bailey, Dixon, Wooten & McDonald, by Kenneth Wooten, Jr., and Sowers, Avery & Crosswhite, by Isaac T. Avery, Jr., for defendant appellant.*

BOBBITT, C.J.

Whether defendant is legally obligated to accept and pay for the three $1,000.00 Series B Bonds is the ultimate question for decision. The answer depends upon whether *the validity* of the Series B Bonds

is subject to successful challenge by defendant on any of the grounds asserted by it.

Defendant's offer to purchase was made with full knowledge of the provisions of the Bond Resolutions of August 29, 1968, and of August 21, 1969, and of the tripartite contracts referred to therein. Hence, we pass without discussion whether "the operating procedures followed by the Authority" are "in violation of the enabling legislation" as now contended by defendant. Nothing appears to indicate that defendant is adversely affected by "the operating procedures followed by the Authority."

As stated in *Nicholson v. Education Assistance Authority,* 275 N.C. 439, 448, 168 S.E. 2d 401, 407: "The fact that both parties to an action, as in the present case, desire the determination of the constitutionality of an entire act of the Legislature and stipulate that certain questions, leading to such determination, are presented by the action for the determination of the Court is not binding upon the Court. Such stipulation does not require, or authorize, the Court to pass upon the constitutional questions *not necessary to the determination of the right of the party who denies the validity of the legislation.*" (Our italics.)

Three basic constitutional questions are presented, *viz.:*

1. Do "student loans" made pursuant to Chapter 1177 constitute a use of public funds for a public purpose?

2. May the General Assembly constitutionally exempt from taxation revenue bonds issued pursuant to Chapter 1177?

3. Does Chapter 1177 provide sufficient legislative standards for making such "student loans?"

The Authority is an agency of the State. Its affairs are governed by a board of directors of seven members, each appointed by the Governor for a prescribed term. G.S. 116-203.

The sole function of the Authority is to facilitate college (and vocational) education of residents of this State at institutions of higher education (and post-secondary business, trade, technical, and other vocational schools). G.S. 116-202. It was authorized to "acquire" from banks or other lending institutions "a contingent interest" not exceeding 80% (100%) of any individual obligation. G.S. 116-206. (Note: The words and figures enclosed by parentheses indicate amendments made by Chapter 955, Session Laws of 1967.) The Authority is empowered, *inter alia,* "(t)o receive and accept from any federal or private agency, corporation, association or person grants to be expended in accomplishing the objectives of the Authority

. . ." G.S. 116-204(6). The Authority is authorized "(t)o make and enter into all contracts and agreements necessary or incidental to the performance of its duties and the execution of its powers under this act." G.S. 116-204(4). G.S. 116-209 provides that "(t)he State Treasurer shall be the custodian of the assets of the Authority."

The facts concerning the status of the Foundation as "a North Carolina nonprofit public educational service corporation" and the membership of its governing board, are set forth sufficiently in the agreed statement of facts.

The 1965 Act which created the Authority provided for an appropriation of $50,000.00 from the Contingency and Emergency Fund. The $50,000.00 so appropriated, together with money obtained from other sources, including grants "from any federal or private agency, corporation, association or person," (G.S. 116-204(6)) was constituted a trust fund. G.S. 116-209. This trust fund was for use "exclusively for the purpose of acquiring contingent or vested interests in obligations" which the Authority was authorized to acquire.

The assets of this trust fund, now referred to as the "Reserve Trust Fund," were available and used solely or primarily as a guaranty fund in respect of student loans made by banks or other lending institutions through the College Foundation, Inc. (Foundation) and serviced by the Foundation.

Prior to the enactment of Chapter 1177, the Foundation had qualified as an "eligible lender" under the federal statutes. The term "eligible lender" is defined in 20 U.S.C.A. § 1085(g). The student loans it made in behalf of banks or other lending institutions qualified for federal interest subsidy benefits, for federal guaranty benefits and for guaranty benefits provided by the Authority. The nature and extent of these benefits will be discussed in our consideration of loans made to students from the proceeds of sale of the Authority's Revenue Bonds.

The authority to issue and sell revenue bonds was conferred by Chapter 1177. It was provided that "(b)onds issued under the provisions of this act (Chapter 1177) shall not be deemed to constitute a debt, liability or obligation of the State or of any political subdivision thereof or a pledge of the faith and credit of the State or of any such political subdivision, but shall be payable solely from the revenues and other funds provided therefor." G.S. 116-209.12. It also provided that revenue bonds issued under its authority "shall at all times be free from taxation by the State or any local unit or political subdivision or other instrumentality of the State, excepting inheritance or gift taxes." G.S. 116-209.13.

Chapter 1177 provides that the Authority shall deposit the proceeds derived from the sale of its revenue bonds to the credit of a trust fund designated "State Education Assistance Authority Loan Fund" (Loan Fund). The Loan Fund is for use by the Authority in making student loans and in acquiring by purchase promissory notes or other legal instruments evidencing student loans made by banks, educational institutions, nonprofit corporations or other lenders. G.S. 116-209.3.

Pursuant to Chapter 1177, the Authority adopted the Bond Resolution of August 29, 1968, which provided for an initial issue of $3,-000,000.00 of Revenue Bonds, Series A, and for additional bonds, "the aggregate principal amount . . . outstanding at any time . . . not (to) exceed Twelve Million, Five Hundred Thousand Dollars ($12,500,000)." The provisions of the Series A Bonds and attached interest coupons are set forth with particularity. The Series A Bonds are dated July 1, 1968, mature July 1, 1988, and bear interest from date at the rate of 5% per annum payable semiannually on the first days of January and July of each year. This Bond Resolution is set forth on Pages 27-100 of the record.

The $3,000,000.00 of Series A Bonds were sold to investors through the Wachovia Bank & Trust Company, which was designated in the Bond Resolution of August 29, 1968, as Fiscal Agent for the Authority, and the proceeds were used, pursuant to the terms of a "Tripartite Contract" dated August 29, 1968, between the Authority, Wachovia Bank & Trust Company and College Foundation, Inc.

The "Tripartite Contract" of August 29, 1968, referred to in the Bond Resolution of that date, provides for the purchase by the Authority from the Foundation of "student obligations," listed on an attached inventory and evidencing "student loans," for a total purchase price of $1,900,000.00, "to be paid solely from the proceeds of Series A Bonds." It also provides for the purchase by the Authority from the Foundation of "additional student obligations," evidencing "student loans" to be made by the Foundation during the period of twelve months commencing September 1, 1968, "the purchase price of which shall not exceed the lesser of (i) One Million, One Hundred Thousand Dollars ($1,100,000) or (ii) an amount equal to the balance of the proceeds of the Series A Bonds available therefor." A recital preceding the contractual provisions recites that "the additional student obligations will bear interest at the rate of six percent (6%) per annum."

The Bond Resolution adopted by the Authority on August 21, 1969, provided for an additional issue of Revenue Bonds, Series B,

of $1,500,000.00, "on a parity with the Series A Bonds," consisting of 1,500 bonds of $1,000.00 each, dated July 1, 1969, maturing July 1, 1989, and bearing interest from date at the rate of 5½% per annum, payable semiannually on the first days of January and July of each year. It was provided that, except as to designation (Series B instead of Series A), the amount of the issue, the date, the maturity, and the interest rate, and the change of name from Wachovia Bank & Trust Company to Wachovia Bank & Trust Company, N.A., Series B Bonds were to be in the form prescribed in the Resolution of August 29, 1968, for Series A Bonds.

A "Supplemental Tripartite Contract" of August 21, 1969, between the Authority, the Foundation and Wachovia Bank & Trust Company, N.A., relates specifically to the Series B Bonds. It provides for the purchase by the Authority from the Foundation of "1969-1970 student obligations," evidencing student loans made by the Foundation during the period of twelve months commencing September 1, 1969, "the purchase price of which shall not exceed the lesser of (i) One Million, Five Hundred Thousand Dollars ($1,500,-000) or (ii) an amount equal to the balance of the proceeds of the Series B Bonds available for the purchase thereof." The recital in the preamble preceding the contractual provisions states that the additional funds for student assistance activities are available for loans "to students who are residents of the State of North Carolina and were enrolled in educational institutions on the date such loan was made and bearing interest at the rate of seven percent (7%) per annum . . . ."

In this Court, the parties have filed a supplement (Supplement) to their original agreed statement of facts. This Supplement discloses, inter alia, the following:

The Foundation, acting as "eligible lender" for the Authority, made 5,548 student loans for the period 1968-1969, which the Authority acquired by use of the proceeds from the sale of its Series A Revenue Bonds. The family income of 94% of the students who obtained these loans was $10,000.00 or less.

The Foundation, acting as "eligible lender" for the Authority, has made 2,418 (additional) student loans, which the Authority has acquired or is obligated to acquire by use of the proceeds of sale of its Series B Revenue Bonds. The family income of 90% of the students who obtained these loans is $10,000.00 or less.

All of these student loans qualify for the federal interest subsidy and the federal guaranteed loan program. 20 U.S.C.A. § 1078. The proceeds from the sale of both Series A and Series B Bonds are used

exclusively to acquire such student loans and to provide for the expenses of issuing the bonds.

In respect of a student loan, including all of those referred to above, which qualifies as a "Guaranteed Student Loan," the federal assistance is twofold:

1. INTEREST SUBSIDY. As to loans made prior to June, 1969, which were financed with the proceeds from the sale of the Series A Bonds, the Federal Government pays 6% interest thereon plus an administrative fee of 1%. As to loans made subsequent to June 1, 1969, financed with the proceeds from the sale of the Series B Bonds, the Federal Government pays 7% interest thereon (and more under special circumstances). These payments are made currently. They continue during the entire time the student is in college or vocational school. They exceed the amount necessary to meet the interest payments on the bonds during the same period.

2. PARTIAL GUARANTEE IN EVENT OF DEFAULT. When a student borrower defaults, the Federal Government pays 80% of the amount in default and 100% in the event of the student's death or disability. Where default occurs, the remaining 20% of the amount thereof is paid by the Authority from its Reserve Trust Fund which, as of April, 1970, had assets of $923,657.00. These assets were held, as provided by the 1965 Act, by the State Treasurer.

The Fiscal Agent, under the tripartite contracts, acts as agent of the Authority with reference to the issuance and sale of the bonds, the receipt and disbursement (as directed) of proceeds from bond sales, and the receipt and disbursement of the funds in a Sinking Fund established for payment of the bonds. The assets of the Sinking Fund include all receipts made on account of student loans from the Federal Government, the student borrower and the Reserve Trust Fund.

Additional factual data will be set forth in connection with our consideration of specific legal questions.

[1]    Chapter 1177 is valid if and only if the purpose for which the proceeds from the sale of the bonds is authorized and required is adjudged *a public purpose.*

[2]    Section 1, Article IX, of the Constitution of North Carolina, provides: "Religion, morality, and knowledge being necessary to good government and the happiness of mankind, schools and the means of education shall forever be encouraged." Section 2 contains a mandate that the General Assembly provide for a State

public school system. Section 3 contains a mandate that the board of commissioners of each county in the State provide the funds for the buildings and equipment necessary for the maintenance and operation of schools within the county for the constitutional term. *Constantian v. Anson County*, 244 N.C. 221, 225, 93 S.E. 2d 163, 166; *Harris v. Board of Commissioners*, 274 N.C. 343, 163 S.E. 2d 387, and cases cited. Section 6 provides for the maintenance by the General Assembly of the University of North Carolina; and Section 7 provides that "the benefits of the University, as far as practicable, be extended to the youth of the State free of expense for tuition . . . ." Unquestionably, the education of residents of this State is a recognized object of State government. Hence, provision therefor is for a public purpose. *Green v. Kitchin*, 229 N.C. 450, 455, 50 S.E. 2d 545, 549; *Jamison v. Charlotte*, 239 N.C. 682, 696, 80 S.E. 2d 904, 914.

In *Clayton v. Kervick*, 244 A. 2d 281 (N.J. 1968), the action was for a declaratory judgment in respect of the New Jersey Educational Facilities Authority. The statute which created the Authority declared it to be "a public body corporate and politic" and an instrumentality exercising "public and essential governmental functions." The Authority was authorized to issue revenue bonds for the construction of facilities, *e.g.*, dormitories, for lease by participating institutions of higher education. In sustaining the constitutionality of the statute, the court stated that the cited constitutional provisions "were designed to insure that public money would be raised and used only for public purpose"; and "(t)hat the furtherance of higher education is a proper public purpose is beyond dispute." *Id.* at 290.

[3] Subject to constitutional limitations, methods to facilitate and achieve the public purpose of providing for the education or training of residents of this State in institutions of higher education or post-secondary schools are for determination by the General Assembly.

[1] The people of North Carolina constitute our State's greatest resource. The agreed facts disclose that bond proceeds are to be used solely to make loans to meritorious North Carolinians of slender means and thereby minimize the number of qualified persons whose education or training is interrupted or abandoned for lack of funds. In our view, and we so hold, the bond proceeds are used for a *public purpose* when used to make such loans.

Of course, it is expected that a student loan will inure to the private benefit of the person who obtains it. It is equally true that the education provided throughout our entire school system is in-

tended to inure to the benefit of the individual who obtains it. However, the fact that the individual obtains a private benefit cannot be considered sufficient ground to defeat the execution of "a paramount public purpose." *Clayton v. Kervick, supra,* at 290.

The proceeds from the sale of the Series B Bonds have been used for or are committed to the purchase of specific student obligations representing loans heretofore made by the Foundation. Questions as to the identity of the persons to whom the loans were made or the identity of the institutions they attend are not raised and in any event do not adversely affect defendant.

The student loans authorized thereby being for a public purpose, we hold that Chapter 1177 does not unconstitutionally authorize use of public funds in violation of Section 3, Article V, or of Section 17, Article I, or of Section 7, Article I, of the Constitution of North Carolina, or of Section 1 of the Fourteenth Amendment to the Constitution of the United States.

[4] The parties present for decision whether the provisions of Chapter 1177 which exempt Authority's revenue bonds from taxation contravene Section 5, Article V, of the Constitution of North Carolina. Section 5, Article V, provides that "(p)roperty belonging to the State or to municipal corporations shall be exempt from taxation" and enumerates other properties the General Assembly may exempt from taxation. The enumerated properties do not include bonds issued by the State or any State agency, whether revenue bonds or full faith and credit bonds.

In *Webb v. Port Commission,* 205 N.C. 663, 172 S.E. 377, this Court considered the same question in connection with revenue bonds issued for a public purpose by the Port Commission of Morehead City. With reference thereto, the Court said: "The provision in the act by which the Port Commission was created that its property and the bonds  that may be issued and sold as authorized by the act shall be exempt from taxation by the State, or any of its political subdivisions, is valid. The General Assembly has the power to so provide, for the reason that the property of the Port Commission will be held, and the bonds will be issued solely for public purposes. Whatever doubt there may be as to the validity of this provision, by reason of section 3 of Article V of the Constitution of this State, must be, under well-settled principles of constitutional construction, resolved in favor of its validity."

"It is generally considered that the legislature of a state has the power to exempt state and municipal bonds from taxation, since if such bonds are exempt from taxation the state or municipality will

be able to issue them on more favorable terms and may then save more money than it would lose by being deprived of the right to tax them. The legislature may exempt such securities from taxation, although the constitution enumerates the subjects of exemption, and does not specifically name government securities, and even in the face of a constitutional declaration forbidding passage of laws exempting 'any property.'" 51 Am. Jur. Taxation § 567, p. 558. Since the tax-exempt feature makes possible a more favorable sale of revenue bonds and thereby contributes substantially to the accomplishment of the public purpose for which they are issued, we hold that the General Assembly *may* exempt them from taxation by the State or any of its subdivisions.

In accord with *Webb v. Port Commission, supra,* we hold that the provisions of Chapter 1177 which exempt the student loan revenue bonds from taxation do not violate Section 5, Article V, of the Constitution of North Carolina.

[5]    Defendant contends the provisions of Chapter 1177, which purport to authorize the Authority to make or purchase "student loans" are violative of Section 8, Article I, and of Section 1, Article II, of the Constitution of North Carolina.

Section 8, Article I, provides: "The legislative, executive, and supreme judicial powers of the government ought to be forever separate and distinct from each other." Section 1, Article II, provides: "The legislative authority shall be vested in two distinct branches, both dependent on the people, to wit: A Senate and a House of Representatives." The question is whether, in respect of determining to whom student loans should be made, the General Assembly delegated its legislative authority without providing sufficient standards for a guide.

"It is settled and fundamental in our law that the legislature may not abdicate its power to make laws nor delegate its *supreme* legislative power to any other coordinate branch or to any agency which it may create. *Coastal Highway v. Turnpike Authority,* 237 N.C. 52, 74 S.E. 2d 310. It is equally well settled that, as to some *specific* subject matter, it may delegate a *limited* portion of its legislative power to an administrative agency *if* it prescribes the standards under which the agency is to exercise the delegated powers." *Turnpike Authority v. Pine Island,* 265 N.C. 109, 114, 143 S.E. 2d 319, 323, and cases cited.

G.S. 116-209.2 provides: "As used in this act, the term 'eligible institution' shall have the same meaning as the definition of such term in section 996 and section 1085 of Title 20 of the United States

Code and the term 'student loan' shall mean loans to residents of this State to enable them to obtain an education in an eligible institution." 20 U.S.C.A. § 1085(a) provides: "The term 'eligible institution' means (1) an institution of higher education, (2) a vocational school, or (3) with respect to students who are nationals of the United States, an institution outside the States which is comparable to an institution of higher education or to a vocational school and which has been approved by the Commissioner for purposes of this part." 20 U.S.C.A. § 996(a), which has been repealed (88 Stat. 1084), contained a definition of "eligible institution" which was not in conflict with that prescribed in § 1085(a).

Chapter 1177 authorizes the Authority "to develop and administer programs and perform all functions necessary or convenient . . . for qualifying for loans, grants, insurance and other benefits and assistance under any program of the United States now or hereafter authorized fostering student loans." G.S. 116-209.3. The Authority was authorized "to contract with the United States of America or any agency or officer thereof . . . respecting the carrying out of the Authority's functions under this act." G.S. 116-209.6. These provisions disclose the General Assembly was well aware of the federal, State and private programs of low-interest insured loans to students in institutions of higher education and other post-secondary schools.

Pertinent provisions of the federal statutes are set forth in summary or verbatim below.

The declared purpose of the federal legislation is to enable the Commissioner of Education "(1) to encourage States and nonprofit private institutions and organizations to establish adequate loan insurance programs for students in eligible institutions (as defined in section 1085 of this title), . . . (3) to pay a portion of the interest on loans to qualified students which are made by a State under a direct loan program meeting the requirements of section 1078-(a)(1)(B) of this title, or which are insured under this part or under a program of a State or of a nonprofit private institution or organization which meets the requirements of section 1078(a)(1)(C) of this title, and (4) to guarantee a portion of each loan insured under a program of a State or of a nonprofit private institution or organization which meets the requirements of section 1078(a)(1)(C) of this title." 20 U.S.C.A. § 1071(a).

To qualify for the federal assistance, consisting of (1) interest subsidy and (2) partial guaranty in the event of default, as set forth above, the "adjusted family income" of the student-borrower must

be "less than $15,000.00 at the time of execution of the note or written agreement evidencing such loan." 20 U.S.C.A. § 1078(a)(1)(C). The total of the loans made to a student in any academic year may not exceed $1,500.00. The aggregate insured unpaid principal amount of all such insured loans made to any student shall not at any time exceed $7,500.00. 20 U.S.C.A. § 1075(a).

A loan by an eligible lender is insurable "only if — (1) made to a student who (A) has been accepted for enrollment at an eligible institution or, in the case of a student already attending such institution, is in good standing there as determined by the institution, and (B) is carrying at least one-half of the normal full-time workload as determined by the institution, and (C) has provided the lender with a statement of the institution which sets forth a schedule of the tuition and fees applicable to that student and its estimate of the cost of board and room for such a student . . ." 20 U.S.C.A. § 1077(a). § 1077(a)(2) sets out in detail the content of "a note or other written agreement" evidencing an insurable student loan including the times and terms of repayment. Subject to enumerated exceptions, such note is to provide for repayment "of the principal amount of the loan in installments over a period of not less than five years (unless sooner repaid) nor more than ten years beginning not earlier than nine months nor later than one year after the date on which the student ceases to carry at an eligible institution at least one-half of the normal full-time academic workload as determined by the institution . . . ."

The interest rate on an insurable loan may not exceed the maximum prescribed by the Secretary of Health, Education and Welfare. 20 U.S.C.A. § 1077(a)(2)(D). The Secretary cannot prescribe a maximum interest rate in excess of 7% on the unpaid principal balance of the loan. 20 U.S.C.A. 1077(b).

The foregoing indicates clearly that Congress has established sufficient standards in respect of loans that qualify for the interest subsidy and for the 80% insurance or guaranty. The agreed statement of facts (Supplement) discloses that all loans made and to be made from the proceeds of the sale of bonds are qualified for the federal assistance.

Persons who obtain "student loans" are unable to make payment on account of interest or principal until completion of their education by graduation or otherwise. The assistance of the Federal Government and coordination with its program are prerequisite to the functioning of the North Carolina student loan program:

Although not set forth in express terms, we think it implicit in the provisions of Chapter 1177, that the General Assembly contemplated and intended that no loans would be made from the proceeds from the sale of tax-exempt revenue bonds except student loans made in compliance with the standards prescribed by the federal legislation and therefore qualified for the federal assistance referred to above. Seemingly, the General Assembly realized that its specification of more precise standards for "student loans" might impede the functioning of the Authority and render it unable to qualify from time to time for the federal assistance upon which its program depended.

[6, 7]    We are of the opinion, and so hold, that the only student loans the Authority is authorized to make or purchase are student loans which qualify under the federal statutes for federal assistance in respect of interest subsidy and guaranty. When the minimum standards prescribed by Chapter 1177 (G.S. 116-209.2), to wit, "loans to residents of this State to enable them to obtain an education in an eligible institution," are supplemented by the standards prescribed by the federal legislation, the legislative standards are sufficient. "To construe the statute otherwise would raise a serious question as to its constitutionality; and it is well settled that a statute will not be construed so as to raise such question if a different construction, which will avoid the question of constitutionality, is reasonable." *Milk Commission v. Food Stores*, 270 N.C. 323, 331, 154 S.E. 2d 548, 555.

Whether the North Carolina student loan program is wise or unwise is for determination by the General Assembly. Whether the tax-exempt revenue bonds should be approved for investment by fiduciaries and for deposit "for any purpose for which the deposit of bonds or obligations of the State is now or may hereafter be authorized by law," G.S. 116-209.10, is for determination by the General Assembly. Whether the purchase of these bonds is wise or unwise is for determination by the investor. Our function relates solely to the validity of the Series B Bonds.

Having determined that Chapter 1177 does not violate any of the provisions of the State or Federal Constitutions referred to in the questions posed by the parties in the agreed statement, the judgment of the court below is affirmed.

Affirmed.

LAKE, J., dissenting:

The bonds which the plaintiff proposes to deliver to the defend-

ant state upon their respective faces, "This bond shall not be deemed to constitute a debt, liability or obligation of the State of North Carolina or of any political subdivision thereof," and that the plaintiff, itself, "shall not be obligated to pay this bond or the interest" thereon, except from the revenues and other funds pledged for such payment.

Each bond further states, "This bond, its transfer and the income therefrom * * * shall at all times be free from taxation by the State of North Carolina or any local unit or political subdivision or other instrumentality of the State, excepting inheritance or gift taxes."

Although the Legislature, in G.S. 116-209.13, undertook to grant such tax exemption, it is my view that the bonds, if issued, will be subject to the tax presently levied by G.S. 105-202 upon intangible personal property and to any tax hereafter lawfully levied generally upon bonds and other evidences of indebtedness, To the extent that the statute, under which these bonds are proposed to be issued, purports to grant an exemption of these bonds from the intangible property tax, it is, in my opinion, in violation of Article V, § 5, of the Constitution of North Carolina, and, therefore, is ineffective.

Article V, § 5, of the Constitution, is entitled "Property Exempt from Taxation." It provides:

> "Property belonging to the State, counties and municipal corporations shall be exempt from taxation. The General Assembly may exempt cemeteries and property held for educational, scientific, literary, cultural, charitable or religious purposes, and, to a value not exceeding three hundred dollars ($300.00), any personal property. * * *"

This constitutional provision applies to ad valorem taxes on property only. *Sykes v. Clayton, Commissioner of Revenue,* 274 N.C. 398, 405, 163 S.E. 2d 775; *Stedman v. Winston-Salem,* 204 N.C. 203, 167 S.E. 813. As we said in the *Sykes* case, however, it does apply to "the taxation of real and personal property, tangible and intangible, according to the value thereof." Thus, it applies to the intangible property tax levied by G.S. 105-202 upon bonds and other evidences of indebtedness. In *Sale v. Johnson, Commissioner of Revenue,* 258 N.C. 749, 129 S.E. 2d 465, Parker, J., later C.J., speaking for the Court, said, "The power to exempt from taxation, as well as the power to tax, is an essential attribute of sovereignty." However, the sovereign is the State, not the Legislature. The Legislature, like this Court, is subject to the restrictions placed upon it by the sovereign in the Constitution. In *Rockingham County v. Elon College,* 219 N.C. 342, 345, 13 S.E. 2d 618, in *Hospital v. Guilford County,*

218 N.C. 673, 12 S.E. 2d 265, and in *Odd Fellows v. Swain*, 217 N.C. 632, 637, 9 S.E. 2d 365, this Court recognized that the Legislature has no authority to exempt from ad valorem taxation any property, except by virtue of this provision of the Constitution.

These bonds, if and when issued, will be property. They will be property of the same kind as is a note, or a bond, of an individual student, or of his parent, given to the defendant bank in consideration of a loan of money to such student or parent for use by the student in paying his expenses in attending a school or college. When issued, they will be held by the plaintiff bank, or by its transferee, for the purpose of receiving the interest due thereon, as it falls due, and receiving the principal at maturity. Use of such interest and principal, when collected, by the holder of the bond is completely unrestricted. The purpose of the bank, or of its transferee, in holding these bonds will be precisely the same as its purpose in holding any other bond or note evidencing a loan made by the bank. Consequently, the exemption of the bonds from taxation cannot be supported on the basis of the purpose for which they are to be held. It is obvious that the bonds, in the hands of the bank or of its transferee, will not constitute property held for educational, scientific, literary, cultural, charitable or religious purposes. They will be held as any other property is held for investment.

The bonds, when issued, will be the property of the bank or of its transferee, not that of the issuing Authority. Consequently, except in the unlikely event of a subsequent transfer to a municipal corporation, a county, the State, or an agency of one of these, exemption of the bonds from the intangible property tax cannot be supported on the basis of the status of the holder of the bonds.

The mandatory exemption granted by the first sentence of Article V, § 5, of the Constitution, depends upon the status of the owner of the property — the State, counties or municipal corporations. The authority conferred upon the General Assembly to exempt property owned by others is limited to property held for one or more of the specified purposes. *Hospital v. Guilford County, supra; Odd Fellows v. Swain, supra.* Thus, neither the mandatory exemption nor the permissive exemption granted or authorized by Article V, § 5, of the Constitution, extends to these bonds in the hands of the defendant or its transferee. It is well settled that exemptions from taxation, constitutional as well as statutory, are to be strictly construed against the claim of exemption and in favor of the taxing power. *Isaacs v. Clayton, Commissioner of Revenue,* 270 N.C. 424, 154 S.E. 2d 532; *Yacht Co. v. High, Commissioner of Revenue,* 265 N.C. 653, 144

S.E. 2d 821; *Chemical Corp. v. Johnson, Commissioner of Revenue,* 257 N.C. 666, 127 S.E. 2d 262; *Benson v. Johnston County,* 209 N.C. 751, 185 S.E. 6; *Rich v. Doughton,* 192 N.C. 604, 135 S.E. 527; *R. R. v. Commissioners,* 75 N.C. 474.

It has been settled by decisions of this Court that, notwithstanding Article V, § 5, of the Constitution, the Legislature may exempt from taxation obligations of the State and those of its political subdivisions. *Mecklenburg County v. Insurance Co.,* 210 N.C. 171, 185 S.E. 654; *Pullen v. Corporation Commission,* 152 N.C. 548, 68 S.E. 155. The reason for this rule is not shown in the majority opinion in either of these decisions. It is stated in the dissenting opinion of Clark, C.J., in the *Pullen* case and lies in the circumstance that the exemption of the State's own obligation from taxation enables the State to obtain a lower interest rate on its indebtedness so that the effect is approximately the same as if the obligation were taxed. See also 51 Am. Jur., Taxation, § 567.

This exception to the limitation of Article V, § 5, of the Constitution, upon the power of the Legislature to exempt property from ad valorem taxation, has no application to the present case for the reason that these bonds expressly state that they are not obligations of the State or of any of its political subdivisions. Even the plaintiff Authority, itself, is not obligated to pay the principal of or the interest upon these bonds except by application of the specified revenues and other funds pledged for that purpose. Thus, the attempted exemption of these bonds from the ad valorem intangible property tax cannot be supported on the ground that it will result in a lowering of interest rates otherwise payable by the State or by one of its subdivisions.

In *Webb v. Port Commission,* 205 N.C. 663, 172 S.E. 377, the Port Commission of Morehead City was authorized by statute to issue bonds in order to provide funds with which to build terminals, wharves, piers, warehouses and other port facilities for general public and common carrier use. Clearly, this was a purpose for which the State, or its municipality, could have issued its own bonds pledging its general credit, which bonds could have been exempted from taxation under the decisions above cited. The statute authorizing the issuance of the bonds provided that they would be exempt from State, county and municipal taxation. The statute further provided that the bonds were payable solely from the income of the commission from wharfage fees and the like, although there was a provision for a tax upon property within the city for the purpose of supplying any deficiency of such funds if, but only if, such tax was approved by a

vote of the people of the city. The statute authorized and contemplated the private sale of the entire bond issue to the Reconstruction Finance Corporation, an agency of the Federal Government. The commission contemplated marketing the bonds in that manner. The authority of the Port Commission to issue the bonds was attacked on the ground that the statute was a violation of Article VIII, § 1, of the Constitution of North Carolina, in that it was an attempt to create a corporation by a special act of the General Assembly. This was the basic attack though other questions were also raised, including the validity of the provision for tax exemption. Connor (George W.), J., in his opinion, stated:

"The provision in the act by which the Port Commission was created that its property and the bonds that may be issued and sold as authorized by the act shall be exempt from taxation by the State, or any of its political subdivisions, is valid. The General Assembly has the power to so provide, for the reason that the property of the Port Commission will be held, and the bonds will be issued solely for public purposes. Whatever doubt there may be as to the validity of this provision, by reason of *section 3* of Article V of the Constitution of this State, must be, under well settled principles of constitutional construction, resolved in favor of its validity. *Certainly, if the bonds are sold to an agency of the United States Government, as contemplated by the act, the provision is valid so long as the bonds are held by such agency, or by any person, firm or corporation holding the same by purchase from such agency.*" (Emphasis added.)

Mr. Justice Connor cited no authority for this pronouncement. His opinion makes no reference whatever to Article V, § 5, of the Constitution. His opinion makes it clear that he regarded the bonds as exempt from taxation because they were to be issued to a Federal agency (The Reconstruction Finance Corporation). Obviously, bonds held by an agency of the United States would be exempt from State taxation. This, no doubt, explains the rather casual treatment of the tax exemption, considered without respect to the status of the holder of the bonds.

At the time the Port Commission case was decided, this was a five-judge Court. Stacy, C.J., and Brogden, J., dissented. Their opinion does not mention the matter of tax exemption. Adams, J., concurred in result on the ground that the statute did not violate Article VIII, § 1, of the Constitution, his concurring opinion making no reference to the validity of the provision for tax exemption. Clarkson, J., also concurred in a separate opinion, which contained no dis-

cussion of the tax exemption but stated that the applicability of Article VIII, § 1, of the Constitution, was the "only serious question" and was the question which the Court, in its order setting the case for argument, had directed counsel to argue.

Thus, the statement in the opinion of Connor, J., in the Port Commission case concerning the validity of the provision for tax exemption of revenue bonds issued by the Port Commission, cannot be deemed a clear-cut determination by this Court of the validity under Article V, § 5, of the Constitution, of a purported grant of tax exemption to revenue bonds, declaring that they are not obligations of the State or of any of its political subdivisions, which bonds are issued to and held by private investors for investment purposes only. With the utmost respect for the opinion of our distinguished predecessor upon this Court, I cannot regard his statement, unsupported by authority and not mentioning Article V, § 5, of the Constitution, as conclusive or persuasive, upon this question which is presented for the first time in the present case.

I, therefore, conclude that Article V, § 5, of the Constitution of this State, renders invalid the legislative grant of an exemption of these bonds from the intangible property tax. This provision of the Constitution has no application to an exemption of the interest payable upon these bonds from income taxation. Article V, § 3, permits the General Assembly "to classify property and other subjects for taxation," subject only to the limitations that the power shall be exercised on a statewide basis and "in a just and equitable manner." This section expressly empowers the General Assembly to make provision for deductions from gross income in the computation of taxable income. In the absence of a constitutional limitation upon the power of the General Assembly to exempt the interest payable upon these bonds from income taxation, the power to exempt being an essential attribute of sovereignty, as declared in *Sale v. Johnson, Commissioner of Revenue, supra,* this provision in the act authorizing the issuance of the bonds here in question is within the legislative authority.

The act provides in G.S. 116-203, "There is hereby created and constituted a political subdivision of the State to be known as the 'State Education Assistance Authority.'" However, in G.S. 116-209.1 it provides, "Any of the foregoing provisions of this act which shall be in conflict with the provisions hereinbelow set forth shall be repealed to the extent of such conflict." In G.S. 116-209.12 it provides, "Bonds issued under the provisions of this act shall not be deemed to constitute a debt, liability or obligation of the State or of any

political subdivision thereof or a pledge of the faith and credit of the State or of any such political subdivision, but shall be payable solely from the revenues and other funds provided therefor." While somewhat confusing, the net effect of these three sections of the act is, at least, that the Authority is not to be considered a political subdivision of the State for the purpose of determining the effect and validity of these bonds.

The plaintiff contracted to deliver to the defendant bonds totally exempt from State, county and municipal taxation. The bonds the plaintiff now proposes to deliver are, in my opinion, subject to the intangible property tax now levied by the State and to such other taxes as may lawfully be levied upon intangible personal property. The variance is substantial. Since the defendant is not being tendered the bonds it contracted to purchase, it should not be compelled to receive and pay for the bonds which the plaintiff now offers to it. It is my view that the superior court erred in adjudging that the bonds, themselves, are exempt from taxation and that the defendant must accept and pay for these bonds.