*142 Justice HUDSON
dissenting.
Because the Opportunity Scholarship Program provides for the spending of taxpayer money on private schools without incorporating any standards for determining whether students receive a sound basic— or indeed, any — education, I conclude that the program violates the North Carolina Constitution in two respects. As a result, I must respectfully dissent.
First, the Opportunity Scholarship Program (also known as the “voucher program”) violates the requirements of Article V, Sections 2(1) and 2(7) that public funds be spent for public purposes only. “The power of taxation shall be exercised in a just and equitable manner, for public purposes only, and shall never be surrendered, suspended, or contracted away.” N.C. Const, art. V, § 2(1). Additionally, “[t]he General Assembly may enact laws whereby the State, any county, city or town, and any other public corporation may contract with and appropriate money to any person, association, or coiporation for the accomplishment of public purposes only.” Id. § 2(7). Second, in so doing, the spending authorized under the voucher program also violates Article I, Section 15, which states: “The people have a right to the privilege of education, and it is the duty of the State to guard and maintain that right.” Id. art. I, § 15.
In its order the trial court includes the following among the “Undisputed Material Facts”:
4. Private schools that receive scholarship funds are (1) not required to be accredited by the State Board of Education or any other state or national institution; (2) not required to employ teachers or principals who are licensed or have any particular credentials, degrees, experience, or expertise in education; (3) not subject to any requirements regarding the curriculum that they teach; (4) not required to provide a minimum amount of instructional time; and (5) not prohibited from discriminating against applicants or students on the basis of religion. See N.C. Gen. Stat. § 115C-562.1 et seq.
[[Image here]]
6. Of the 5,556 scholarship applicants, 3,804 applicants identified 446 private schools they planned to attend. Of those 446 schools, 322 are religious schools &nd 117 are independent schools. Of the 322 religious schools *143 scholarship recipients planned to attend, 128 are accredited by some organization and 194 are not accredited by any organization. Of the 117 independent schools scholarship recipients planned to attend, 58 are accredited by some organization and 59 are not accredited by any organization.
The trial court then reached the following conclusions of law, among others:
3. The Court concludes from the record beyond a reasonable doubt that the [Opportunity Scholarship Program] Legislation funds private schools with taxpayer dollars as an alternative to the public school system in direct contravention of Article [I], Section[ ] 15 . . . and Article V, Sections 2(1) and (7) of the North Carolina Constitution. The legislation unconstitutionally
[[Image here]]
b. appropriates public funds for education in a manner that does not accomplish a public purpose, in violation of Article V, Sections 2(1) and (7), in particular by appropriating funds to private primary and secondary schools without regard to whether these schools satisfy substantive educational standards: appropriating taxpayer funds to unaccountable schools does not accomplish a public purpose;
[[Image here]]
e. fails to “guard and maintain” the right of the people to the privilege of education in violation of Article I, Section 15 by appropriating taxpayer funds to educational institutions that are not required to meet educational standards, including curriculum and requirements that teachers and principals be certified[.]
[[Image here]]
4. The General Assembly fails the children of North Carolina when they are sent with taxpayer money to private schools that have no legal obligation to teach them anything.
*144 As noted above, these facts are undisputed, and in my view, these conclusions are correct.
In Madison Cablevision, Inc. v. City of Morganton this Court articulated a two-part test for determining if a spending statute complies with the requirements of the North Carolina Constitution as found in Article V, Section 2(1), which is quoted above and known as the “public purpose” clause. 325 N.C. 634, 646, 386 S.E.2d 200, 207 (1989). As noted by the majority, while “[t]he initial responsibility for determining what is and what is not a public purpose rests with the legislature” and “its determinations are entitled to great weight,” “the ultimate responsibility for the public purpose determination rests, of course, with this Court.” Id. at 644-45, 386 S.E.2d at 206 (internal citations omitted). Further, in Stanley v. Department of Conservation and Development this Court articulated the following principle regarding public purpose expenditures: “In determining what is a public purpose the courts look not only to the ends sought to be attained but also ‘to the means to be used.’ ” 284 N.C. 15, 34, 199 S.E.2d 641, 653 (1973) (citations omitted), abrogated in part on other grounds by Madison Cablevision, 325 N.C. at 647-48, 386 S.E.2d at 208, and superseded by constitutional amendment, N.C. Const, art V, §§ 2(7), 9. Therefore, I conclude that the majority’s assertion that “our public purpose analysis does not turn on whether the appropriation will. . . ‘accomplish’ a public purpose” is contrary to our precedent. It is precisely this determination that we are called upon to undertake here. To that end, this Court has articulated “[t]wo guiding principles” for determining whether an expenditure of tax funds is for a public purpose. Madison Cablevision, 325 N.C. at 646, 386 S.E.2d at 207 (citations omitted) (involving operation of a public enterprise by a municipality). A governmental expenditure satisfies the public purpose clause if: “(1) it involves a reasonable connection with the convenience and necessity of the particular [jurisdiction], and (2) the activity benefits the public generally, as opposed to special interests or persons.” Id.
Defendants assert, and I agree with the majority, that our courts have long held that education generally serves a public purpose. See, e.g., State Educ. Assistance Auth. v. Bank of Statesville, 276 N.C. 576, 587, 174 S.E.2d 551, 559 (1970) (“Unquestionably, the education of residents of this State is a recognized object of State government. Hence, provision therefor is for a public purpose.” (citations omitted)). I further agree with the majority that, in principle, “the provision of monetary assistance to lower-income families so that their children have greater educational opportunities is well within the scope of permissible governmental action and is intimately related to the needs of our state’s citizenry.”
*145 Nonetheless, I cannot agree that the spending of taxpayer funds on private school education through the Opportunity Scholarship Program here serves “public purposes only” as our constitution requires. N.C. Const. art. V, § 2(1). In Leandro v. State this Court concluded that “the right to education provided in the state constitution is a right to a sound basic education. An education that does not serve the purpose of preparing students to participate and compete in the society in which they live and work is devoid of substance and is constitutionally inadequate.” 346 N.C. 336, 345, 488 S.E.2d 249, 254 (1997). We went on to say in Hoke County Board of Education v. State that a sound basic education should include an “effective instructional program” taught by “competent, certified, well-trained” teachers and led by “well-trained competent” principals. 358 N.C. 605, 636, 599 S.E.2d 365, 389 (2004). Admittedly, this is the standard we have set for our public schools, not our private ones, and it is conceivable that we would set a less comprehensive substantive standard for private schools. However, a large gap opens between Leandro-required standards and no standards at all, which is what we have here. When taxpayer money is used, the total absence of standards cannot be constitutional.
Before the legislature created the Opportunity Scholarship Program, taxpayer money had not been used to directly finance any part of a private school education. The expenditure of public taxpayer funds brings the Opportunity Scholarship Program squarely within the requirements of Article V, Sections 2(1) and 2(7). As the trial court noted, the schools that may receive Opportunity Scholarship Program money have no required teacher training or credentials and no required curriculum or other means of measuring whether the education received by students at these schools prepares them “to participate and compete in the society in which they five and work.” Leandro, 346 N.C. at 345, 488 S.E.2d at 254. As we have observed in State Education Assistance Authority v. Bank of Statesville, “[t]he people of North Carolina constitute our State’s greatest resource.” 276 N.C. at 587, 174 S.E.2d at 559. Educating our citizens plants the seeds for their participation, and when we are able to reap the rewards of having an educated citizenry, we can see that our people are our greatest resource. See, e.g., Saine v. State, 210 N.C. App. 594, 604-05, 709 S.E.2d 379, 388 (2011) (“Educating North Carolinians certainly promotes the welfare of our State, particularly at a time when unemployment is high and many jobs that have historically not required education beyond a high school diploma, or its equivalent, are rapidly disappearing.”). Therefore, while students enrolled in private schools may be receiving a fine education, if taxpayer money is spent on a private school education that does not prepare them to function *146 in and to contribute to our state’s society, that spending cannot be for “public purposes only.” In my view, spending on private schools through the Opportunity Scholarship Program, which includes no means to measure the quality of the education, cannot satisfy the second prong of the Madison Cablevision test. The main constitutional flaw in this program is that it provides no framework at all for evaluating any of the participating schools’ contribution to public purposes; such a huge omission is a constitutional black hole into which the entire program should disappear.
I am not persuaded by any of defendants’ arguments that the program, as created, contains standards that are constitutionally relevant or adequate. Defendants assert that “layers” of accountability standards are built into the Opportunity Scholarship Program. I find none of these arguments convincing. First, defendants argue that the “educational marketplace” will regulate the quality of the education provided by participating schools. Defendants assert that parents will not send their children to schools that do not provide a solid education or adequately prepare students for college or beyond. This may be true, but marketplace standards are not a measure of constitutionality. To the contrary, this Court must insulate constitutional standards from the whims of the marketplace. See Maready v. City of Winston-Salem, 342 N.C. 708, 739, 467 S.E.2d 615, 634 (1996) (Orr, J., dissenting) (“While economic times have changed and will continue to change, the philosophy that constitutional interpretation and application are subject to the whims of ‘everybody’s doing it’ cannot be sustained.”).
In a related argument, both intervenor legislative officers and inter-venor parents contend that, because parents choose the private schools, the program is “directly accountable to the parents.” This argument serves only to underscore that the program serves the private interests of the particular families and not the public good. While families are surely entitled to choose schools for their children according to their interests, a program like the Opportunity Scholarship Program that spends taxpayer money must, to be constitutional, serve “public purposes only.”
Second, defendants look to the statutory requirements governing all private and nonpublic schools in North Carolina. These standards relate to attendance, health, and safety, and also require standardized testing at certain intervals. See N.C.G.S. §§ 115C-547 to -562 (2013). Here, however, we are not considering standards for private schools that receive no public funding. Those schools are not governed by the same constitutional requirements as schools receiving public funding; they need not serve “public purposes only.” When considering these statutory standards in a *147 public purpose context, it is clear that they do not help measure whether the students enrolled are receiving an education that prepares them to function in our state’s society. Even the requirement regarding standardized testing falls short: that provision simply mandates that all private schools “administer, at least once in each school year, a nationally standardized test... to all students enrolled or regularly attending grades three, six, and nine.” Id. § 115C-549; see also id. § 115C-557. A similar testing requirement exists for eleventh grade students. Id. § 115C-550; see also id. § 115C-558. These testing standards do not specify that students take any particular test, nor do they require any minimum result. When a wide range of testing options are available and administered, it can be difficult to compare results across schools (a tool which is regularly used to determine the efficacy of our public schools). While the regulations governing private schools do require comparisons with public school populations, these provisions impose no consequences, regardless of test results. Moreover, the standards require no accreditation of schools and no particular training or certification of teachers. As a result, these standards fail to ensure that spending on these schools through public Opportunity Scholarship Program funds is for any public purpose.
Third, defendants point to statutes regulating schools participating in the Opportunity Scholarship Program. In addition to the above requirements for private and nonpublic schools, schools wishing to participate in the program must also:
(1) Provide to the [State Education Assistance] Authority documentation for required tuition and fees charged to the student by the nonpublic school.
(2) Provide to the Authority a criminal background check conducted for the staff member with the highest decision-making authority, as defined by the bylaws, articles of incorporation, or other governing document, to ensure that person has not been convicted of any crime fisted in G.S. 115C-332.
(3) Provide to the parent or guardian of an eligible student, whose tuition and fees are paid in whole or in part with a scholarship grant, an annual written explanation of the student’s progress, including the student’s scores on standardized achievement tests.
(4) Administer, at least once in each school year, a nationally standardized test or other nationally standardized *148 equivalent measurement selected by the chief administrative officer of the nonpublic school to all eligible students whose tuition and fees are paid in whole or in part with a scholarship grant enrolled in grades three and higher. The nationally standardized test or other equivalent measurement selected must measure achievement in the areas of English grammar, reading, spelling, and mathematics. Test performance data shall be submitted to the Authority by July 15 of each year. Test performance data reported to the Authority under this subdivision is not a public record under Chapter 132 of the General Statutes.
(5) Provide to the Authority graduation rates of the students receiving scholarship grants in a manner consistent with nationally recognized standards.
(6) Contract with a certified public accountant to perform a financial review, consistent with generally accepted accounting principles, for each school year in which the school accepts students receiving more than three hundred thousand dollars ($300,000) in scholarship grants awarded under this Part.
Id. § 115C-562.5(a) (2014). Like the standards referenced above for private schools in general, none of these additional requirements relates to the quality of education received by enrolled students. Simply mandating that a report card be sent home to parents provides no guarantee that the education received is sufficient. And the same problems exist as articulated above regarding the requirements to administer standardized tests.
Finally, defendants point out the Opportunity Scholarship Program is required by statute to report to the General Assembly. Under Section 115C-562.7, the program’s overseers must report annually to the legislature specific administrative statistics (relating to enrollment numbers, student demographics, and funds received), as well as “[1] earning gains or losses of students receiving scholarship grants.” Id. § 115C-562.7 (2014). While the data will allow the legislature insight into the successes of the program, such reporting does not determine constitutionality. First, the legislature is under no obligation to act on the reports. Second, as we held long ago in Madison Cablevision, it is ultimately up to this Court to determine if public spending serves a public purpose. 325 N.C. at 644-45, 386 S.E.2d at 206. Legislative oversight does not automatically make a *149 controversial program constitutional, particularly when, as here, the law creating and governing the program mandates no action.
Defendants themselves admit that the program lacks the standards outlined in Hoke County for the employment of certified teachers and principals and for curriculum. Hoke Cty. Bd. of Educ., 358 N.C. at 636, 599 S.E.2d at 389. Despite this concession, they argue that because this is a facial challenge to the statute, plaintiffs must show that the program is unconstitutional under all conceivable facts and circumstances. See, e.g., Martin v. N.C. Hous. Corp., 277 N.C. 29, 44, 175 S.E.2d 665, 673 (1970). To that end, defendants argue that even if substantive standards were required under our state constitution, some of the participating private schools would meet those standards. This argument falls short, however, because our state constitution mandates that every child obtaining an education paid for by public funds receive an education that prepares him to succeed in society, and because we are analyzing the statutory framework of the program, not the merits of a specific school. N.C. Const. art. I, § 15; id. art. IX, § 2(1); Leandro, 346 N.C. at 351, 488 S.E.2d at 257 (concluding that our state constitution “requires that all children have the opportunity for a sound basic education” (emphasis added)). While I acknowledge that “[w]e seldom uphold facial challenges because it is the role of the legislature, rather than this Court, to balance disparate interests and find a workable compromise among them,” it is important to remember that we must also “measure the balance struck in the statute against the minimum standards required by the constitution.” Beaufort Cty. Bd. of Educ. v. Beaufort Cty. Bd. of Comm’rs, 363 N.C. 500, 502, 681 S.E.2d 278, 280-81 (2009) (citation omitted). Here those minimum standards require that children receiving a publicly funded education obtain an education that serves a public purpose. The statute at issue here creates a program that fails to incorporate any requirement to determine, much less ensure, that any, let alone all, children enrolled are receiving a real education; as such, the statute cannot survive a facial challenge.
Private schools are free to provide whatever education they deem fit within the governing statutes’ requirements. When parents send their children to any private school of their, choosing on their own dime, as they are free to do, that education need not satisfy our constitutional demand that it be a for a public purpose. However, when public funds are spent to enable a private school education, that spending must satisfy the public purpose clause of our constitution by preparing students to contribute to society. Without meaningful standards meant to ensure that this or any minimum threshold is met, public funds cannot be spent constitutionally through this Opportunity Scholarship Program.
*150 As stated above, I would not necessarily impose the same detailed requirements on our private schools receiving public funds as are imposed on purely public schools by Leandro and its progeny. I do conclude that such spending must include some standards by which to measure compliance with the public purpose doctrine; the complete lack of any such standards in North Carolina’s voucher program makes determining such compliance impossible. It is instructive that all other states that have adopted similar programs have included substantive requirements. Although other states certainly are not bound by constitutional obligations identical to ours, examining their similar programs and the substantive standards imposed on participating schools exposes the woeful lack of oversight in the Opportunity Scholarship Program here. For example, compared with ten similar programs across the country, North Carolina’s program falls painfully short. As opposed to other jurisdictions’ legislative requirements for participating private schools in the categories of state approval or accreditation, state-required curriculum, required teacher qualifications, required participation in a state testing program, and required number of instructional days or hours, the Opportunity Scholarship Program fails to incorporate any of those mandates. In comparison, six of the ten other jurisdictions have requirements in all those areas; nine out of ten have requirements in at least four of the five areas; and all ten have requirements in at least one of these areas.[13] For example, in Indiana (which has the largest state wide voucher program in the country), participating schools must be accredited, Ind. Code. § 20-51-l-6(a)(3) (2010); Ind. Code. Ann. § 20-51-1-4.7(4) (West 2013), and must teach subjects prescribed by the State, Ind. Code. Ann. § 20-51-4-l(f)(9) (West 2011). These schools must participate in state wide testing. Id. § 20-51-1-4.7(5) (West 2013). In Louisiana participating schools must be approved by a state board, and approval is contingent on a showing that the quality of the curriculum is at least as high as that mandated for similarly situated public schools. La. Stat. Ann. § 17:11 (2001); id. § 17:4021(A) (WestSupp. 2012). Even in Arizona, the least regulated jurisdiction behind North Carolina identified by amici, participating schools must educate students in reading, grammar, math, social studies, and science. Ariz. Rev. Stat. Ann. § 15-2402(B)(1) (West Supp. 2011). As summarized above, North Carolina’s Opportunity Scholarship Program lacks any land of substantive oversight, curriculum standards, or instructional requirements. Schools receiving public *151 funding through the program are essentially free to employ whomever they desire to teach whatever they desire. This is a perfectly acceptable scheme for truly private schools, but it fails utterly to satisfy the constitutionally mandated educational standards required when public funds are spent on education.
This failure brings me to the second constitutional flaw in the Opportunity Scholarship Program: the breach of the State’s duty to guard and maintain the right to the privilege of education as set forth in Article I, Section 15, which is part of our constitution’s Declaration of Rights. Notwithstanding this constitutional provision’s clear statement that the people of our State have “a right to . . . education” and that it is the State’s duty “to guard and maintain that right,” N.C. Const, art. I, § 15, the majority indicates that this constitutional provision merely states a “general proposition concerning the right to the privilege of education”; that this provision is merely aspirational, rather than substantive, in nature; and that plaintiffs’ reliance on it as an independent source of relief is misplaced. The majority has not, however, cited any decision from this Court in support of this proposition, and I believe the majority’s assertion is inconsistent with this Court’s constitutional jurisprudence.
In Leandro this Court concluded that Article I, Section 15 and Article IX, Section 2 of the North Carolina Constitution worked together in combination to “guarantee every child of this state an opportunity to receive a sound basic education in our public schools.” 346 N.C. at 347, 488 S.E.2d at 255. In other words, this Court gave Article I, Section 15, considered in conjunction with other constitutional provisions, substantive effect. As such, the plain language of Article I, Section 15 and this Court’s decision in Leandro regarding the interplay between Article I, Section 15 and Article IX, Section 2 makes me unable to accept the majority’s statements regarding the substantive import of this constitutional provision. See John V. Orth & Paul Martin Newby, The North Carolina State Constitution 62-63 (2d ed. 2013) (citingLeandro as an example in which, along with other constitutional provisions, Article I, Section 15 was given substantive effect by this Court and stating that “[i]n addition to the substantive component, this section may also secure other rights, the violation of which could subject a local school board to suit without the benefit of governmental immunity or insurance coverage”).
Turning to the application of Article I, Section 15 to the instant matter, this voucher program, as explained above, allows for taxpayer funds to be spent on private schooling with no required standard to ensure that teachers are competent or that students are learning at all. I must conclude that by creating this program, the State’s legislature has *152 completely abrogated the duty to “guard and maintain [the] right” to an education. N.C. Const, art I, § 15. As the trial court concluded, “[t]he General Assembly fails the children of North Carolina when they are sent with taxpayer money to private schools that have no legal obligation to teach them anything.” This failure violates the duty set forth in Article I, Section 15.
This Court’s duty to the people of our State, as expressed in several clauses of our constitution, is to ensure that if taxpayer money is spent on private education, the expenditure is for an education that can prepare our children to participate and thrive in our state’s society. When the General Assembly fails to ensure that these constitutional requirements are satisfied, this Court must exercise its responsibility to do otherwise. Because the majority fails to do so, I respectfully dissent.
Justices BEASLEY and ERVIN join in this dissenting opinion.

. According to the brief filed by amici curiae Education Scholars, the other jurisdictions include Arizona, Cleveland, the District of Columbia, Indiana, Louisiana, Maine, Milwaukee, Ohio, Vermont, and Wisconsin.