Stanley, Edwards, Henderson v. Dept. Conservation & Development

JOHN ·H. STANLEY ON BEHALF OF HIMSELF AND ALL OTHERS OF THE
    SAME OR LIKE CLASS

— v. —

THE DEPARTMENT OF CONSERVATION AND DEVELOPMENT OF
    THE STATE OF NORTH CAROLINA AND THE NORTHAMPTON
    COUNTY POLLUTION ABATEMENT AND INDUSTRIAL FACILI-
    TIES FINANCING AUTHORITY

CHARLES M. EDWARDS ON BEHALF OF HIMSELF AND ALL OTHERS OF THE
    SAME OR LIKE CLASS

— v. —

THE DEPARTMENT OF CONSERVATION AND DEVELOPMENT
    OF THE STATE OF NORTH CAROLINA AND THE HALIFAX
    COUNTY POLLUTION ABATEMENT AND INDUSTRIAL FACILI-
    TIES FINANCING AUTHORITY

CHARLES RAY HENDERSON ON BEHALF OF HIMSELF AND ALL OTHERS
    OF THE SAME OR LIKE CLASS

— v. —

THE DEPARTMENT OF CONSERVATION AND DEVELOPMENT
    OF THE STATE OF NORTH CAROLINA AND ·THE JONES
    COUNTY POLLUTION ABATEMENT AND INDUSTRIAL FACILI-
    TIES FINANCING AUTHORITY

Nos. 80, 81, 82

(Filed 10 October 1973)

1. Constitutional Law § 4— standing to attack statute — question of law
    When the facts with reference to a party's relation to a contro-
versy are admitted, whether a party has standing to attack the con-
stitutionality of a statute is a question of law which may not be settled
by the parties.

2. Actions § 3; Courts § 2— absence of controversy — dismissal of action
    Whenever it appears that no genuine controversy between the par-
ties exists, the court will dismiss the action ex mero motu.

3. Constitutional Law § 4— standing of taxpayers to attack statute
    Taxpayers have standing to attack the constitutionality of the Pol-
lution Abatement and Industrial Facilities Financing Act, G.S. 159A-1
et seq., where they alleged that the Act unconstitutionally purports
to authorize the issuance of bonds which are exempt from all taxes
except inheritance and gift taxes.

4. Appeal and Error § 3; Constitutional Law § 4— consideration of
    constitutionality of statute — public interest
    The public interest requires that the Supreme Court decide whether
the Pollution Abatement and Industrial Facilities Financing Act is con-

stitutional in whole or in part, although no revenue bonds authorized by the Act have been offered for sale.

**5. Municipal Corporations § 1—municipal corporations—public purpose**

If a legislative enactment comprehends a public purpose, the agency created under it may function as a municipal corporation; otherwise, not.

**6. Municipal Corporations § 1—municipal corporations—public purpose**

A municipal corporation, even with legislative sanction, cannot engage in a private enterprise or assume any function which is not in a legal sense public in nature.

**7. Municipal Corporations § 39; Taxation § 21—municipal corporation revenue bonds — exemption from taxation**

The General Assembly may exempt revenue bonds of a municipal corporation from taxation since the tax-exempt feature makes possible a more favorable sale of the bonds and thereby contributes substantially to the accomplishment of the public purpose for which they are issued.

**8. Taxation § 7—public purpose**

An activity cannot be for a public purpose unless it is properly the "business of government," and it is not a function of government either to engage in private business itself or to aid particular business ventures.

**9. Taxation § 7—public purpose—incidental benefit to public**

Aid to a private concern by the use of public money or by tax-exempt revenue-bond financing is not justified by the incidental advantage to the public which results from the promotion and prosperity of private enterprises.

**10. Taxation § 7—public purpose**

In determining what is a public purpose, the courts look not only to the end sought to be attained but also to the means to be used.

**11. Taxation § 7— public purpose—direct assistance to private entity**

Direct assistance to a private entity may not be the means used to effect a public purpose.

**12. Taxation § 7—public purpose—legislative declaration**

While a legislative declaration that an enactment is for a public purpose carries great weight, it is not conclusive upon the courts.

**13. Taxation § 7—public purpose—tax-exempt revenue bonds**

The public purpose requirement determines not only the projects for which the legislature may authorize the expenditure of tax money but also those which it may empower authorities it creates to undertake and to finance by the issuance of tax-exempt revenue bonds.

**14. Constitutional Law § 13; Nuisance § 10—abatement and control of pollution—police power**

The abatement and control of environmental pollution are immediately necessary to the public health, safety, and general welfare; and,

in the exercise of the State's police power, the legislature has plenary authority to abate and control pollution of all kinds.

15. **Constitutional Law § 11; Taxation § 1— regulation of private industries — police power — taxing power**

The power of the State to regulate private institutions and industries under its police power is more extensive than the authority to accomplish the same purpose by use of its taxing power.

16. **Nuisance § 10; Taxation § 7— Pollution Abatement and Industrial Facilities Financing Act — unconstitutionality**

The creation of county authorities pursuant to the Pollution Abatement and Industrial Facilities Financing Act for the purpose of financing pollution control facilities or industrial facilities for private industry by the issuance of tax-exempt revenue bonds is not for a public purpose, and the Act violates Article V, § 2(1) of the North Carolina Constitution.

IN cases Nos. 80 and 81 petitioners alone appeal from *Hobgood, J.*, 12 March 1973, Civil Session of WAKE; in case No. 82 all parties appeal. The appeals were certified under G.S. 7A-31(b)(1) for initial appellate review by the Supreme Court. They were docketed and argued at the Spring Term as cases Nos. 89, 90, and 91.

These three separate proceedings were instituted in Wake County on 30 November 1972 under G.S. 143-309 (1964) and G.S. 159A-21 (1972) by a citizen and taxpayer of the respective counties of Northampton, Halifax, and Jones for judicial review of resolutions of the North Carolina Board of Conservation and Development determining that the creation of the Pollution Abatement and Industrial Facilities Financing Authority of each of the three counties is for a public purpose and approving bond issues by the Halifax and Northampton Authorities for pollution abatement facilities and by the Jones Authority for an industrial facility project. The petitions for review challenge the constitutionality of the North Carolina Pollution Abatement and Industrial Facilities Financing Act, 1971 Session Laws, Chapter 633, codified as N. C. Gen. Stats., Ch. 159A, §§ 159A-1 through 159A-25 (1972) and hereinafter referred to as "the Act."

In its beginning the Act recites the General Assembly's findings and determination (1) that full employment and prosperity in the State is dependent upon the expansion of industry, which is accompanied by increased noise and gaseous, liquid, and solid wastes which pollute the State's air, land, and waters;

(2) that to control environmental pollution, which is menacing the citizens' health, safety, and welfare, the various levels of government must require and coordinate reduction, treatment, and disposal of pollutants; (3) that lack of employment opportunities in certain areas which have not shared in the State's general prosperity threatens the general safety, morals, and welfare; (4) that unemployment can best be eliminated by attracting and retaining private enterprises and stimulating industrial building programs in the depressed areas of the State; and (5) that in providing for the creation of county authorities which shall operate as corporate political subdivisions of the State for the purpose of (a) pollution control financing "and/or" (b) industrial facilities financing in the counties where employment opportunities are absent and wages and per capita income are below average, the General Assembly acts in the public interest and serves a public purpose. G.S. 159A-2.

G.S. 159A-3 defines the significant terms used in the Act. G.S. 159A-4 authorizes each county to create by resolution or ordinance "a political subdivision and body corporate and politic of the State known as 'The _ _____ County Pollution Abatement and Industrial Facilities Financing Authority,' " and specifies the manner of its establishment.

Acting in strict compliance with the requirements of G.S. 159A-3, by resolution adopted 1 November 1971, the Board of Commissioners of Jones County created the Jones County Pollution Abatement and Industrial Facilities Financing Authority (Jones Authority). On 6 March 1972 the Halifax County and Northampton County Pollution Abatement and Industrial Facilities Financing Authorities (Halifax Authority and Northampton Authority) were similarly created. Each resolution authorized the Authority created to issue its bonds for pollution control purposes and industrial facility financing purposes, pursuant to and in accordance with the provisions of the Act.

Within 120 days after the creation of the three authorities, as required by G.S. 159A-4(f), each Authority, stating the basis for the request, applied to the State Board of Conservation and Development (Board) for a determination that the Authority's proposed operation is for a public purpose. At the Board's quarterly meeting on 13 May 1972, after investigation and advertisement as required by G.S. 159A-4(f), in separate resolutions the Board made the findings of fact and conclusions summarized below:

*Jones County.* The proposed operation of the Jones Authority is for a public purpose for that (1) substantial stream pollution of the Trent and White Oak rivers now exists within the county; and (2) the county is a *distressed area* within the meaning of G.S. 159A-3 (6a) a, b, c, d, and f, in that (a) during the immediately preceding calendar year with respect to which published reports are available the established rate of unemployment among the labor force of the county was at least 6% ; (b) the estimated average manufacturing wage of factory production workers in the county was at least 10% less than the State average for the same period; (c) the estimated average per capita personal income in the county was 10% less than the State average for the same period; (d) the county has suffered a 1% or more loss of population between 1960 and 1970; and (f) the county is eligible for assistance under "Section 401(a) of the Public Works and Economic Development Act of 1965 (Public Laws 89-136, Title IV, 401)."

*Halifax County.* The proposed operation of the Halifax Authority is for a public purpose for that (1) substantial air, water, and noise pollution now exists within the county, and (2) the county is a distressed area within the meaning of G.S. 159A-3 (6a), c, d, and f.

*Northampton County.* The proposed operation of the Northampton Authority is for a public purpose for that (1) substantial air, water, and noise pollution now exists within the county; and (2) the county is a distressed area within the meaning of G.S. 159A-3 (6a), a, b, c, d, and f.

No challenge was made to the foregoing findings of fact or conclusions of law as provided in G.S. 159A-4(f) and G.S. 143-309 and the Board's findings of fact are not in controversy now.

Among the powers which G.S. 159A-5 confers upon an authority is the power (1) to acquire, by any means except eminent domain, real and personal property for use as, or in conjunction with, any industrial facility, pollution control or abatement facility, water management or solid waste disposal facility, and research facilities related to manufacturing, processing manufactured, agricultural, mineral, and animal products ("projects" as defined in G.S. 159A-5) ; (2) to construct, acquire, own, lease, or renovate one or more projects and to sell, lease, exchange, "or otherwise dispose of" projects; (3) to issue

its bonds to provide funds to pay all or part of any project or to refund bonds already issued.

An authority's project must be located within the county for which it was created. G.S. 159A-6. No project financed under the Act may be operated by an authority, the State, or any of its subdivisions. Such projects must be leased for operation and maintenance under a lease in form and substance as provided in G.S. 159A-7.

Before an authority may issue bonds to finance a project G.S. 159A-21 requires it to obtain the Board's approval of the proposed project. To approve a project the Board must find: (1) The conditions upon which it based its original conclusion that the creation of the authority was for a public purpose have not changed materially. (2) The proposed project, according to information available, will (i) alleviate specific pollution conditions or (ii) "will alleviate or tend to alleviate" the conditions of below average manufacturing wage, per capita income, or high unemployment and make a significant contribution to the economic growth of the county and advance the prosperity and public welfare of the county and State; and (3) The proposed project will not cause the abandonment of an industrial or research facility existing elsewhere in the State.

If the Board approves the proposed project G.S. 159A-21 requires that it publish notice of its findings and approval in a newspaper of general circulation in the county for which the authority was created. Within 30 days after such publication G.S. 159A-21 provides that the Board's findings and approval may be reviewed in the Superior Court of Wake County as provided by G.S. 143-309. If no "person who is aggrieved" by such findings and approval petitions for review within the prescribed 30 days, the statute declares that the authority to issue the bonds and the legality thereof "shall be conclusively presumed, and no court shall have authority to inquire into such matters."

In addition to the Board's approval of a bond issue an authority must obtain the approval of the Local Government Commission of North Carolina before it is empowered to issue the bonds. G.S. 159A-12. This statute also prescribes the manner in which the form, terms, rate of interest, execution, and sale of the bonds shall be determined, and it requires the proceeds of each bond issued to be used solely for the purposes for which the bonds were issued.

Any bonds issued under the Act "shall not be deemed to constitute a debt of the State or of any political subdivision or of any agency thereof or a pledge of the faith and credit of the State or of any political subdivision or of any such agency, but shall be payable solely from the revenues, proceeds, and other funds pledged therefor." G.S. 159A-11(a). Further, the expenses of an authority, incurred in carrying out the provisions of the Act, are payable only from project revenues, bond sale proceeds, and contributions made to the authority. G.S. 159A-11(b).

G.S. 159A-8 provides that, except for gift and inheritance taxes, any bonds issued by an authority pursuant to the Act, their transfer, and the income therefrom (including any profit made on a sale thereof) shall be exempt from all taxation by the State or any subdivision or agency thereof. An authority is exempt from both income and property taxes, but the statute requires authority's lessee to list the lease-hold interest for taxation at "the same value as the fee interest in that property."

On 3 October 1972, proceeding under G.S. 159A-21, the Halifax Authority applied to the Board for permission to issue bonds for pollution control purposes in the amount of $13,400,000. On 4 October 1972, the Northampton Authority applied for approval of a bond issue for the same purpose in the amount of $2,500,000. The Jones Authority, on 29 September 1972, applied for approval of a bond issue in the amount of $3,000,000 for the purpose of financing industrial facilities. Thus, in cases Nos. 80 and 81, pollution control bonds only are involved; in case No. 82, industrial bonds only.

The situation which prompted the Halifax and Northampton Authorities to propose the bond issues for which they seek approval is summarized below:

The Albemarle Paper Company (Albemarle), a Delaware corporation, doing business in North Carolina is a wholly owned subsidiary of Hoerner-Waldorf Corporation (Hoerner-Waldorf), also a Delaware corporation doing business in this State. Albemarle is engaged in the manufacture of paper and paper products in Northampton and Halifax counties. Its mill is located on the Roanoke River in Roanoke Rapids, Halifax County, directly across the river from the town of Gaston in Northampton County. The mill, which has been in operation for many years, now employs 700 people on a three-shift, seven-day per week basis, 360 days per year. Each day it produces about 937 tons of unbleached Kraft pulp and paper.

The mill's annual air polution emissions are approximately 6.6 million pounds of particulate matter, 5.6 million pounds of odorous sulphur compounds, and 10.5 million pounds of sulphur dioxide. The particulate includes a fine white ash which corrodes the finish on every automobile and causes the paint to peel from houses and all other structures. These air pollutants have a sharp, disagreeable odor which permeates the air and invades every enclosure for miles around. Albemarle's air pollution control devices provide no control for odors.

Albemarle daily discharges liquid effluent (sewage and waste water containing dissolved and suspended solids) into the river. These water pollution emissions are noxious and deleterious to the health and property of the citizens of Halifax and Northampton counties. This waste, which "flows in million gallons per day," is chemically reduced by natural biological activity. Microorganisms in the river, while consuming this waste, also consume the oxygen dissolved in the river. The uncontrolled discharge of waste into the river reduces dissolved oxygen to the point where aquatic life cannot exist. Such discharges from Albemarle's mill have, from time to time, resulted in massive fish kills in the river, the last recorded one having occurred in April 1972. In April 1963 a discharge by Albemarle killed an estimated 57,200 fish. Wood sugar dissolved in Albemarle's waste water causes slime bacteria to develop in spectacular proportions. Green slime pervades the river and covers the lines of fishermen. Below the mill the river carries the same terrible odors as the mill itself.

On account of both its air and water pollution emissions Albemarle is now and has been conducting its operations in violation of the laws and regulations of the State of North Carolina.

On 30 June 1969 Albemarle's permit (issued 18 September 1964) to discharge effluent into the river expired. Between that date and 26 November 1971, the record indicates that the company continued to discharge pollutants into the river without a permit. On 26 November 1971, in accordance with N. C. Gen. Stats., Ch. 143, art. 21 (1971 Supp.), Albemarle applied to the State Board of Water and Air Resources for a permit to construct an "Effluent and Treatment System," which would meet legal requirements and treat all the liquid waste from Albemarle's mill and for a permit to discharge waste from the proposed treatment plant into the river. The application stated that

"the proposed works," would be completed and in operation on or before 15 September 1973. The estimated cost of this facility, to be constructed partly in Halifax County and partly in Northampton County, was $3,380,000. The cost of the Halifax portion was estimated to be $880,000; the Northampton portion, $2,500,000.

On the basis of the foregoing application, on 2 March 1972, the Water and Air Resources Board issued to Albemarle a conditional permit, effective until 31 December 1976, to construct the proposed waste water treatment facility and to discharge the treated effluent into the river. One of the conditions imposed was that the proposed facility be completed and in operation on or before 15 September 1973. The permit directed that the "existing wastewater treatment facility" be maintained and operated "so as to effect overall reductions in pollution and to produce an effluent of such quality as to protect the receiving stream."

On 3 May 1972 the Board of Water and Air Resources issued a temporary permit to Albemarle "for exact planning" of an air pollution control project for its plant in Roanoke Rapids to be located entirely in Halifax County and to cost $12,520,000. It is to finance this air pollution project and also the $880,000 portion of the Albemarle water treatment system to be constructed in Halifax County that the Halifax Authority proposes to issue revenue bonds in the sum of $13,400,000. It is to finance the construction of that portion of the water treatment system to be located in Northampton County that the Northampton Authority proposes to issue revenue bonds in the amount of $2,500,000.

The construction of the air and water pollution control facilities for which permits have been issued to Albemarle is necessary to bring it in compliance with the applicable statutes, rules, and regulations.

On 1 September 1972 the Halifax and Northampton Authorities, Albemarle, and Hoerner-Waldorf entered into a contract with reference to these facilities under which the respective authority, pursuant to the Act, would acquire the site, finance and construct that portion of the project located in its county and, upon terms consistent with G.S. 159A-7, lease the facilities to Albemarle.

*Inter alia,* the contract provides that (1) the implementation and legal effectiveness of the agreement are wholly dependent upon the successful resolution of the legal questions with respect to the power of the Authorities to issue revenue bonds; (2) this power and the legality of the bonds having been established, the Authorities will authorize and sell the bonds as soon as practicable; (3) the proceeds from the sale of the bonds will be applied to the acquisition and construction costs of the pollution control facilities, including the reimbursement of Albemarle of moneys expended by it in connection with such acquisition and construction; (4) should the proposed financing arrangement fail for any reason to materialize or to be completed successfully Albemarle will indemnify the Authorities for any expenses incurred up to the time the program is terminated; (5) Hoerner-Waldorf will execute to the trustee for the bondholders an unconditional guaranty that the principal of the bonds, any premium, and the interest thereon will be promptly paid as the same become due.

The prospective lease agreement, attached to the contract as an exhibit, provided, *inter alia,* that Albemarle will (1) maintain the facilities, (2) pay to the Authorities a rental sufficient "to pay the principal of, interest on, and redemption premium, if any, on the bonds" when the same become due and also "all costs, fees, and expenses" incurred by the Authorities in providing the financing of the facilities and performing their obligations under the contract-lease agreements; (3) pay ad valorem taxes lawfully assessed on its leasehold interest; (4) be obligated to purchase the facilities for the sum of $100 at the termination of the lease following full payment of the bonds (or upon specified contingencies not here material) ; and (5) have the option after ten years from the date the final installment of the first year's rental obligation is payable under the lease, to purchase the facilities for a sum sufficient to redeem the bonds, to pay all expenses incident thereto, and any obligations payable under the agreements with the Authorities, plus $100.

The facts motivating the Jones Authority to seek approval of the industrial facilities bonds which it proposes to issue in the amount of $3,000,000 are summarized below:

Albemarle has proposed to construct and operate in Jones County a lumber plant which will (1) cost approximately

$3,000,000; (2) produce 30,000,000 board feet of air-dried, planed dimension lumber on a 245-day, 3-shift operation; (3) employ 83 people at an average wage of $160 per week; (4) activate 10-15 logging firms in the area which will employ 150 people at "wages probably exceeding the average Jones County wage"; (5) provide "stumpage benefits for landowners"; and (6) provide $30,000 annually in lieu of ad valorem taxes.

The Jones Authority, Albemarle, and Hoerner-Waldorf have entered into an agreement in which the Jones Authority agrees to issue revenue bonds to finance the construction of the lumber plant, which it will own in fee and lease to Albemarle by a lease agreement consistent with G.S. 159A-7. There is no substantial difference between this contract and the lease agreement and the contract and lease agreement which Albemarle and Hoerner-Waldorf made with the Halifax and Northampton Authorities. Hoerner-Waldorf also guarantees Albemarle's performance of its contractual obligations to the Jones Authority.

On 14 October 1972 the Board made the findings required by G.S. 159A-21 and approved the application of each of the three Authorities to issue its revenue bonds for the respective project in aid of Albemarle. Thereafter notice of the Board's findings and approval of the bond issues was duly published.

Within thirty days after the Board published notice of its approval of the bond issues proposed by the Halifax, Northampton, and Jones Authorities, in strict compliance with G.S. 159A-21 and G.S. 143-309, petitioners instituted these three proceedings for judicial review of the Board's findings and conclusions. Each petitioner alleges that he is a person aggrieved by the Board's approval of the bond issue proposed by his county's Authority and that he is entitled to judicial review of the Board's action as provided in G.S. 143-307 (1964). Defendants admit this allegation.

The petitioner in case No. 80, John H. Stanley, is a citizen and resident of Northampton County, where he owns real and personal property upon which he pays both municipal and county ad valorem taxes. To the State of North Carolina he pays income, sales, and intangible taxes and a privilege tax to practice medicine. He engages in farming operations in Northampton County which require him to borrow money from time to time and to execute notes therefor which are not tax exempt. He owns stock and securities in one or more North Carolina

corporations which own real and personal property in the State and which have issued bonds which are not tax exempt.

Petitioner in case No. 81, Charles M. Edwards, is a citizen and resident of Halifax County, where he is engaged in the real estate business and owns a trailer park. Except for his occupation no material difference exists between his situation, status, and holdings and that of petitioner in case No. 80. Petitioner in case No. 82 is Charles Ray Henderson, a citizen and resident of Jones County, a salaried employee and the owner of a farm and vineyard in Jones County. Except for his occupation, his situation is likewise not materially different from that of the other two petitioners.

Each petitioner alleges that the Act is unconstitutional, and any bonds issued under it are invalid in that the Act (1) violates Article V, Section 2(1) of the North Carolina Constitution and the due process and equal protection clauses of the State and Federal Constitutions by authorizing the use of the proceeds of revenue bonds for other than public purposes; (2) violates Article V, Section 3(2) of the Constitution by lending the credit of the State without a vote of the people; (3) violates Article V, Section 2(5) and 4 of the Constitution by creating a debt of the State or a county without a vote of the people; (4) violates Article V, Section 2(3) of the Constitution by exempting from taxation the property of an entity that is not a municipal corporation; (5) violates Article I, Section 6 and Article II, Section 1 of the Constitution by unlawfully delegating legislative authority to the created Authorities, the Department and Board of Conservation and Development, and the Local Government Commission.

In the Superior Court these three cases were consolidated for trial and heard by Judge Hobgood on the pleadings and stipulations. The facts as hereinabove stated are either alleged and admitted in the pleadings or are set out in the stipulations. Additionally, the parties made the following stipulations:

A. Each of the Authorities entered into the agreements with Albemarle and Hoerner-Waldorf without any finding by the Authorities or by the Board of Conservation and Development that Albemarle is unable to finance the proposed projects without the assistance of the Authorities.

B. The revenue bonds which the Authorities propose to issue, the income therefrom, and the transfer and profits from

the sale thereof, "are declared exempt" from all State and Federal taxation except inheritance and gift taxes and tax-exempt bonds carry a lower interest rate than bonds of like quality which are not tax exempt.

C. The issuance of tax-exempt bonds rather than corporate bonds will reduce tax revenues to local, State, and Federal governments; and petitioners, as taxpayers, "are constitutionally entitled to require that the proceeds from tax-exempt bonds be used for a public purpose and to be free from the additional burden placed upon [them] as taxpayers by the granting of tax exemptions other than for a public purpose."

Upon the hearing Judge Hobgood adopted the stipulations in each case. In Nos. 80 and 81 he decreed that the Act violates none of the constitutional provisions upon which petitioners rely and that the tax-exempt bonds which the Halifax and Northampton Authorities propose to issue for pollution abatement purposes are for a public purpose and lawful. In case No. 82 he adjudged (1) that the Act, insofar as it pertains to the financing of industrial facility projects, violates N. C. Const. art. V, § 2(1), the due process and equal protection clauses of N. C. Const. art. I, § 19, and the Fourteenth Amendment of the United States Constitution; and (2) that the issuance of tax-exempt bonds pursuant to the Act for industrial facilities purposes is unlawful.

In this Court the three appeals were consolidated for argument and decision.

*Taylor, Brinson & Aycock for petitioners.*

*Attorney General Morgan; Chief Deputy Attorney General McGalliard for defendant, Department of Conservation and Development.*

*Felton Turner, Jr., for defendant, Northampton County Pollution Abatement and Industrial Facilities Financing Authority.*

*Rom B. Parker, Jr., for defendant, Halifax County Pollution Abatement and Industrial Facilities Financing Authority.*

*James R. Hood for defendant, Jones County Pollution Abatement and Industrial Facilities Financing Authority.*

SHARP, Justice.

The first question we consider is whether the petitioners, as taxpayers, have standing to challenge the constitutionality of the Act.

The Halifax, Jones, and Northampton Authorities have not spent—nor do they contemplate spending—any funds derived from taxation. As yet they have issued no bonds. However, they were created solely for the purpose of issuing tax-exempt revenue bonds to finance the projects specified in the Act and, if—and when—there is a "successful resolution" of the constitutional questions with respect to their power to issue such bonds, they propose to issue them immediately.

Under our decisions "[o]nly those persons may call into question the validity of a statute who have been injuriously affected thereby in their persons, property or constitutional rights." *Canteen Service v. Johnson,* 256 N.C. 155, 166, 123 S.E. 2d 582, 589 (1962). *See also Nicholson v. Education Assistance Authority,* 275 N.C. 439, 168 S.E. 2d 401 (1969); *In Re Assessment of Sales Tax,* 259 N.C. 589, 131 S.E. 2d 441 (1963); *Carringer v. Alverson,* 254 N.C. 204, 118 S.E. 2d 408 (1961); *James v. Denny,* 214 N.C. 470, 199 S.E. 617 (1938). The rationale of this rule is that only one with a genuine grievance, one personally injured by a statute, can be trusted to battle the issue. "The 'gist of the question of standing' is whether the party seeking relief has 'alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentations of issues upon which the court so largely depends for illumination of difficult constitutional questions.' " *Flast v. Cohen,* 392 U.S. 83, 99, 20 L.Ed. 2d 947, 961, 88 S.Ct. 1942, 1952 (1968).

[1, 2] All parties to these proceedings, anxious to have resolved the legal questions which will determine the validity of the bonds, have requested the Court, "in the public interest," to decide the constitutional questions which have been raised. They also stipulate that each petitioner is, within the meaning of G.S. 143-307, a party aggrieved by the Board's action in approving the issuance of the bonds and that each has standing to obtain judicial review of the Board's action. Standing, however, like jurisdiction, cannot be conferred by stipulation. When, as here, the facts with reference to a party's relation to a controversy are admitted, whether the party has standing to attack

the constitutionality of a statute is a question of law, which may not be settled by the parties. *Nicholson v. Education Assistance Authority, supra; Carringer v. Alverson, supra.* Whenever it appears that no genuine controversy between the parties exists, the Court will dismiss the action *ex mero motu. Bizzell v. Insurance Co.*, 248 N.C. 294, 103 S.E. 2d 348 (1958).

[3] In this case, however, we hold that the petitioners have standing to assail the constitutionality of the Act and that a genuine controversy between them is ripe for decision. *See Lide v. Mears*, 231 N.C. 111, 56 S.E. 2d 404 (1949).

Petitioners have alleged, *inter alia*, that in G.S. 159A-8 the Act unconstitutionally purports to authorize the issuance of bonds which are exempt from all taxes except inheritance and gift taxes. If this purported exemption is unconstitutional petitioners will be injured unless its invalidity is judicially declared for the exemption of any property from its fair share of the public burden, to that extent, increases the burden imposed upon all other taxable property. "A taxpayer injuriously affected by a statute may generally attack its validity. Thus, he may attack a statute which . . . exempts persons or property from taxation, or imposes on him in its enforcement an additional financial burden, however slight." 16 C.J.S. *Constitutional Law* § 80, at 247-48 (1956).

In *Price v. Philadelphia Parking Authority*, 422 Pa. 317, 221 A. 2d 138 (1966) it was held that the exemption of property from taxation reduces the tax base and has the same effect upon a taxpayer as the unlawful expenditure of tax funds even though he is unable to establish any injury other than his interest as a taxpayer. *See also Village of Moyie Springs v. Aurora Mfg. Co.*, 82 Idaho 337, 353 P. 2d 767 (1960). In *Martin v. Housing Corp.*, 277 N.C. 29, 175 S.E. 2d 665 (1970), and in *Webb v. Port Commission*, 205 N.C. 663, 172 S.E. 377 (1934), this Court, without discussion, permitted taxpayers, as such, to attack the constitutionality of acts which exempted certain revenue bonds from taxation.

Ordinarily, the interest rate on tax-free revenue bonds of a state agency is appreciably lower than that of the bonds of a private corporation, for their tax-exempt feature makes possible a more favorable sale. *Education Assistance Authority v. Bank*, 276 N.C. 576, 174 S.E. 2d 551 (1970). Indeed, the tax advantage is the primary appeal which such bonds have for investors.

*Mitchell v. Financing Authority,* 273 N.C. 137, 159 S.E. 2d 745 (1968). If, therefore, the bonds which the Authorities propose to issue cannot constitutionally be made tax exempt the only reason for the method of corporate financing provided by the Act vanishes. In recognition of this fact Albemarle's contract with each of the Authorities provides: "The CORPORATION and the AUTHORITY reiterate and agree that the implementation and legal effectiveness of this Agreement are wholly dependent and conditioned upon the successful resolution of the legal questions hereinbefore mentioned. . . . "

[4] It is quite clear, therefore, that pending a definitive decision from this Court, these Authorities are effectively stymied, for it cannot be known whether they are bodies corporate or, in effect, nonentities. We concur in the view that the public interest requires that we now decide whether the Act is constitutional in whole or in part. *Smith v. County of Mecklenburg,* 280 N.C. 497, 187 S.E. 2d 67 (1972).

The provisions of G.S. 159A-21 also make an immediate decision appropriate. This section provides that if the Board's approval of the bonds is not challenged by the procedure outlined in G.S. 143-309 within thirty days after notice of such approval has been published, an authority's power to issue the bonds and the legality thereof shall be conclusively presumed, "and no court shall have authority to inquire into such matters." Since petitioners instituted this proceeding for judicial review within the prescribed time the question whether they could thereafter have contested the tax exemption which G.S. 159A-8 purported to give these bonds is not before us. Manifestly, however, in the face of the limitation imposed by G.S. 159A-21, any taxpayer who desired to contest the exemption might reasonably apprehend that he would lose his right to do so if he waited until the bonds had been issued and sold, or offered for sale. *Cf. Harper v. Schooler,* 258 S.C. 486, 189 S.E. 2d 284 (1972). For this reason, all other considerations aside, we think it would be inappropriate to hold that the question is not ripe for decision.

Both factual and procedural differences distinguish these three petitions for review of the Board's administrative approval of the Authorities' proposed bond issues from the case of *Nicholson v. Education Authority, supra.* In *Nicholson,* an action for a mandatory injunction, the plaintiff taxpayer sought to nullify all prior transactions between the defendant State

Education Assistance Authority (Education Authority) and all others and to enjoin the issuance of a second series of bonds which it proposed to issue. Its first series of bonds in the amount of $3,000,000 had been sold at a private sale. This Court held that, on the basis of Nicholson's allegations, which showed no threat of immediate irremediable injury to him, he was not entitled to injunctive relief. The opinion did not specifically discuss the question of the plaintiff's right as a taxpayer to contest in that action the constitutionality of the tax exemption which G.S. 116-209.13 (1971 Supp.) conferred upon the bonds of the Education Authority. We note that the act creating the Education Authority contained no such limitation upon a taxpayer's right to contest the legality of the bonds as does G.S. 159A-21. We also note that, in a properly constituted action for a declaratory judgment (G.S. 1-253 *et seq.*), this Court has since passed upon the constitutionality of the act creating the Education Authority and the validity of its bonds. *Education Assistance Authority v. Bank, supra.*

We proceed, therefore, to the decisive questions raised by petitioner-appellants' assignments of error in cases numbered 80 and 81: (1) Are the Northampton and Halifax Authorities, created under the Act to finance pollution abatement and control facilities for a private industry by the issuance of revenue bonds, established for a public purpose and (2) do the provisions of the Act (G.S. 159A-8) which purport to exempt such bonds from taxation violate N. C. Const. art. V, §§ 2(1) and 2(3)? These questions are, in fact, but one.

[5]    Under the Act each of the three Authorities is denominated a "political subdivision and body corporate and politic of the State," that is, a municipal corporation. The term *municipal* refers not only to cities and towns; ". . . when applied to corporations, the words 'political,' 'municipal,' and 'public' are used interchangeably." *Smith v. School Trustees,* 141 N.C. 143, 150, 53 S.E. 524, 527 (1906) ; *Wells v. Housing Authority,* 213 N.C. 744, 750, 197 S.E. 693, 697 (1938). If a legislative enactment comprehends a public purpose, the agency created under it may function as a municipal corporation; otherwise, not. *Southern Assembly v. Palmer,* 166 N.C. 75, 82 S.E. 18 (1914) ; *Lee v. Poston,* 233 N.C. 546, 64 S.E. 2d 835 (1951) ; *Coastal Highway v. Turnpike Authority,* 237 N.C. 52, 74 S.E. 2d 310 (1952) ; *Powell v. Housing Authority,* 251 N.C. 812, 112 S.E. 2d 386 (1959) ; *Redevelopment Commission v. Guilford County,*

274 N.C. 585, 164 S.E. 2d 476 (1968) ; 5 Strong's N. C. Index 2d, *Municipal Corporations* § 1 (1968).

[6] A municipal corporation, however, even with legislative sanction, cannot engage in a private enterprise or assume any function which is not in a legal sense public in nature. *Keeter v. Lake Lure,* 264 N.C. 252, 264, 141 S.E. 2d 634, 643 (1965) ; *Nash v. Tarboro,* 227 N.C. 283, 285, 42 S.E. 2d 209, 211 (1947). *See Dennis v. Raleigh,* 253 N.C. 400, 116 S.E. 2d 923 (1960). Any authority created under the Act is created for a special purpose and unless that purpose is public it cannot issue tax-exempt revenue bonds. N. C. Const. art. V, §§ 2(1) and 2(3) (1971) (formerly art. V, § 3). *See Martin v. Housing Corp., supra* at 57-58, 175 S.E. 2d at 681-682 (1970) ; *Education Assistance Authority v. Bank, supra* at 588-589, 174 S.E. 2d at 560; *Mecklenburg County v. Insurance Co.,* 210 N.C. 171, 185 S.E. 654 (1936) ; *Webb v. Port Commission, supra;* 49 N. C. L. Rev. 830 (1971). *See also Odd Fellows v. Swain,* 217 N.C. 632, 637-638, 9 S.E. 2d 365, 368 (1940). "The reason municipal property is granted immunity from taxation is, that it is supposed to be dedicated to a public use." *Nash v. Tarboro, supra* at 289, 42 S.E. 2d at 214. *See Warrenton v. Warren County,* 215 N.C. 342, 2 S.E. 2d 463 (1939). It is for the same reason that the bonds of a municipal corporation are exempt from taxation.

[7] "Since the tax-exempt feature makes possible a more favorable sale of revenue bonds and thereby contributes substantially to the accomplishment of the public purpose for which they are issued," this Court holds that the General Assembly *may* exempt them from taxation by the State or any of its subdivisions. *Education Assistance Authority v. Bank, supra* at 589, 174 S.E. 2d at 560; *Martin v. Housing Corp., supra* at 57, 175 S.E. 2d at 681. The rationale for this exemption is stated in *Pullen v. Corporation Commission,* 152 N.C. 548, 558, 68 S.E. 155, 159 (1910).

Patently the Act was designed to enable industrial polluters to finance, at the lowest interest rate obtainable, the pollution abatement and control facilities which the law is belatedly requiring of them. As noted earlier, if it be held that the Authorities cannot constitutionally issue tax-free revenue bonds for that purpose the Act fails, for it has no other objective.

We note that since 1 January 1969 the interest on industrial development bonds of a political subdivision of a State is

excluded from gross income under Section 103(a)(1) of the Internal Revenue Code, 26 U.S.C.A. § 103(a)(1) (1967), *only* in the instances specified in Code Section 103(c), 26 U.S.C.A. § 103(c) (1973 supp.). *Prima facie,* however, if the Northampton and Halifax Authorities are held to be municipal corporations, their revenue bonds would be excluded from gross income under Code Section 103(c)(4)(F). Semble, at the election of the Jones Authority, its bonds could also be made tax exempt under Code Section 103(c)(6)(D).

Because the concept of public purpose must expand to meet the necessities of changed times and conditions, this Court has not attempted to confine public purpose by judicial-definition but has "left each case to be determined by its own peculiar circumstances as from time to time it arises." *Keeter. v. Lake Lure, supra* at 264, 141 S.E. 2d at 643. Our reports contain extensive philosophizing and many decisions on the subject. Most recently we have considered the question whether a purpose was public or private in *Foster v. Medical Care Comm.,* 283 N.C. 110, 195 S.E. 2d 517 (1973); *Martin v. Housing Corp., supra; Redevelopment Comm. v. Guilford County, supra; Mitchell v. Financing Authority, supra.* These decisions, and the cases on which they are based, establish the following principles:

[8]   (1) An activity cannot be for a public purpose unless it is properly the "business of government," and it is not a function of government either to engage in private business itself or to aid particular business ventures. *See* Note, 49 N. C. L. Rev. 830, 833 (1971). It is only when private enterprise has demonstrated its inability or unwillingness to meet a public necessity that government is permitted to invade the private sector. In *Martin v. Housing Corp., supra,* and *Wells v. Housing Authority, supra,* revenue bonds issued by two public housing agencies for the purpose of providing housing for low-income tenants were held to be for a public purpose. Governmental activity in that field was not an intrusion upon private enterprise, which had eschewed the field. Further, the primary benefits passed directly from the public agency to the public and not to a private intermediary.

[9]   (2) Aid to a private concern by the use of public money or by tax-exempt revenue-bond financing is not justified by the incidental advantage to the public which results from the promotion and prosperity of private enterprises.

[10, 11]    (3) In determining what is a public purpose the courts look not only to the end sought to be attained but also "to the means to be used." *Turner v. Reidsville*, 224 N.C. 42, 44, 29 S.E. 2d 211, 213 (1944). *See Wells v. Housing Authority, supra.* Direct assistance to a private entity may not be the means used to effect a public purpose. "It is the essential character of the direct object of the expenditure which must determine its validity, and not the . . . degree to which the general advantage of the community, and thus the public welfare, may be ultimately benefited by their promotion." 63 Am. Jur. 2d *Public Funds* § 59 (1972).

In *Foster v. Medical Care Comm., supra,* it was held that tax funds could not be used to finance a nonprofit hospital albeit "the primary purpose of a nonprofit privately owned hospital is the same as that of a publicly owned hospital for the treatment of like diseases and injuries." The rationale was that such aid would violate the constitutional proscription that "tax revenues may not be used for private individuals or corporations, no matter how benevolent." Also implicit in the *Foster* decision is recognition of the fact that the Medical Care Commission would have had no control over a private hospital and no authority to regulate its rates in the public interest. *See City and County of San Francisco v. Ross*, 270 P. 2d 488 (Cal. 1954).

The Court has not heretofore considered whether the abatement of pollution created by a private industry may be accomplished by means of State aid to the industrial polluter in the form of a tax-free revenue bond financing. However, in *Mitchell v. Financing Authority, supra,* we considered the constitutionality of the Industrial Facilities' Financing Act, Chapter 535, N. C. Sess. Laws (1967) (the Mitchell Enactment), which the legislature enacted for the purpose of attracting industry to the State. Petitioner correctly states that any consideration of the constitutionality of the Pollution Abatement and Industrial Facilities Act (the Act) must begin with *Mitchell v. Financing Authority, supra.*

The Mitchell Enactment created the Industrial Financing Authority and authorized it to issue tax-free revenue bonds in order to provide sites and facilities for lease to private industries. These industries, by rental payments to the Financing Authority, would retire the bonds and thereby acquire the property. After exploring the arguments for and against such State

aid to private industry we held that the Financing Authority's primary function, "to acquire sites and to construct and equip facilities for private industry, is not for a public use or purpose," and that the Financing Authority could not expend the tax funds appropriated for its organization. *Id.* at 159, 159 S.E. 2d at 761.

The defendants in cases Nos. 80 and 81, in support of their contention that *Mitchell* does not control decision in these cases, point to the following differences between the Mitchell Enactment and the Act: (1) The aims of the Act are limited (a) to providing "needed assistance" anywhere in the State for the abatement of pollution, a grave public hazard, and (b) to increasing employment and income in "distressed areas"; (2) the Halifax and Northampton Authorities propose to issue bonds only for pollution abatement, an objective which, they argue, the court should determine to be a public purpose "regardless of the result reached concerning the industrial facilities' portion of the Act"; and (3) no expenditure of tax funds is involved here.

In addition to the foregoing, as petitioners point out for the purpose of attacking the Act, in G.S. 159A-20 the Act specifically provides that no authority created under its provisions "shall have any right or power to acquire any property through the exercise of eminent domain or any proceeding in the nature of eminent domain." The Mitchell Enactment contained no such provision.

We consider these specified differences in reverse order.

In *Mitchell v. Financing Authority,* after noting that the term *public purpose* is generally used in the same sense in the law of taxation and eminent domain, we pointed out (1) that were we to hold the Industrial Facilities Financing Authority served a public purpose when it acquired a site and constructed thereon a manufacturing plant for lease to a private enterprise, we would thereby authorize the legislature to give the Financing Authority the power to condemn private property for any project which it decided to undertake; and (2) that the power of eminent domain could not constitutionally be exercised in behalf of a private interest. *Id.* at 158-159, 159 S.E. 2d at 760. *See Redevelopment Commission v. Bank,* 252 N.C. 595, 603, 114 S.E. 2d 688, 694 (1960). In *Foster v. Medical Care Commission, supra,* we pointed out that "if the General Assembly

may authorize a State agency to expend public money for the purpose of aiding in the construction of a hospital facility to be leased to and ultimately conveyed to a private agency, it may also authorize the acquisition of a site for such facility by exercise of the power of eminent domain." *Id.* at 126, 195 S.E. 2d at 528. *See* 49 N. C. L. Rev. 830.

Obviously, if we hold the creation of an authority for the purpose of issuing tax-exempt revenue bonds to provide funds for the construction of pollution control and abatement (or other) facilities for lease and ultimate conveyance to a private industry to be for a public purpose, any subsequent legislature could repeal G.S. 159A-20 at will and authorize the condemnation of private property for such a project. The consequences of such a decision cannot be ignored. *See Mitchell v. Financing Authority, supra* at 158-159, 159 S.E. 2d at 760.

[12]  The legislative findings and declarations contained in G.S. 159A-2 (b) (1) (2), are that pollution control financing as authorized by the Act is for a public purpose in all areas of the State and that industrial facilities financing to provide job opportunities and better wages in counties which are "distressed areas" as defined by the Act is for a public purpose in these areas. Such a legislative declaration, of course, carries great weight. However, it is not conclusive upon the court. *See Foster v. Medical Care Commission, supra* at 125, 195 S.E. 2d at 527; *Mitchell v. Financing Authority, supra* at 144, 159 S.E. 2d at 750. Petitioners suggest that the General Assembly's positive denial of the right of eminent domain to the authorities indicates a lack of confidence in its own declaration.

[13]  That the Act appropriates no public funds for the organization and work of the county pollution control authorities, and that these appeals involve no expenditure of tax funds, does not exempt the cases from the rationale of *Mitchell v. Financing Authority.* The public purpose requirement determines not only the projects for which the legislature may authorize the expenditure of tax money but also those which it may empower the created authorities to undertake and to finance by the issuance of tax-exempt revenue bonds.

[14]  Does the State serve a public purpose when it assists a private industry in financing the abatement and control of the pollution the industry creates? Beyond any doubt air and water pollution have become two of modern society's most urgent prob-

lems, and noise pollution is likewise a major modern evil. Such pollution knows no boundaries, for it cannot be contained in the area where it occurs. 61 Am. Jur. 2d, *Pollution Control*, §§ 19-30, 53-60, 100 (1972). Regardless of where it occurs, the abatement and control of environmental pollution are immediately necessary to the public health, safety, and general welfare; and, in the exercise of the State's police power, the legislature has plenary authority to abate and control pollution of all kinds. *Taylor v. Racing Asso.*, 241 N.C. 80, 93, 84 S.E. 2d 390, 400 (1954). *See also Shelby v. Power Co.*, 155 N.C. 196, 71 S.E. 218 (1911); *Durham v. Cotton Mills*, 141 N.C. 615, 54 S.E. 453 (1906); 61 Am. Jur. 2d *Pollution Control*, § 69 (1972). For examples of the legislature's exercise of the State's police power to control pollution see, *inter alia*, the following statutes: N. C. Gen. Stats. ch. 143, Art. 21 (Supp. 3C, 1971); ch. 130, Art. 13 (1964), *as amended*, (Supp. 3B 1971); ch. 113A (Supp. 3A 1971); G.S. 14-382 (1919); G.S. 20-128 (1937); G.S. 20-128.1 (1971); G.S. 75A-6(O) (1971); G.S. 75A-10(c) (1965); G.S. 113-265 (1971); G.S. 160A-185 (1971); G.S. 160A-193 (1971).

[15] The power of the State to regulate private institutions and industries under it police power, however, is more extensive than the authority to accomplish the same purpose by use of its taxing power. *Foster v. Medical Care Comm.*, *supra* at 126, 195 S.E. 2d at 528. It does not follow, therefore, that because the State has power to order an industry to abate a nuisance or cease operations it may constitutionally assist the industry in financing the abatement.

Pulp and paper mills are recognized to be among the major industrial pollutants, 61 Am. Jur. 2d *Pollution Control*, § 20 (1972), and Albemarle is no exception. In their briefs defendants pose this question with reference to the pollution which Albemarle is creating: "Does the public in common benefit from the elimination of the dumping of tons of solid waste every day into the Roanoke River, the reduction of odors emitted into the air, the drastic reduction of suspended solids in the air, the elimination of the necessity to breathe air containing various sulphur compounds, the control of slime bacteria in the Roanoke River, the elimination from the air of chemicals so strong that they cause the paint to come off houses and cars, and the general improvement and cleaning up of the total environment?"

To ask this question is, of course, to answer it. Certainly the elimination of the terrible conditions described above will

benefit all the people. Furthermore, they are entitled to its elimination, and the State is now using its police power to abate the nuisance and halt the damage to the environment which this pollution has caused.

It is stipulated that Albemarle's air and water pollution emissions are and have been in violation of the laws and regulations of the State; that it is and has been operating under temporary, conditional permits; and that if Albemarle is to continue its operations it must reduce its air and water emission to the legal limits. *See* G.S. 143-215.2(b); G.S. 143-215.6 (1967). There is no finding that Albemarle is unable to provide the required facilities at its own expense and without outside assistance. Indeed, upon the argument of these cases, defendants conceded that Albemarle is able to correct the pollution it creates and that construction of the necessary facilities is in progress.

It is recognized that the net result of revenue bond financing such as the Act authorizes "is that the municipality lends its tax-free bond issuing power to the private corporation or organization so that the interest on what would otherwise be a private bond issue becomes free of income tax and a low interest rate on borrowed money is obtained." 64 Am. Jur. 2d, *Public Securities and Obligations* § 109 (1972). *See Mitchell v. Financing Authority, supra* at 146, 159 S.E. 2d at 751-752. Thus the Act would permit the Authorities to do indirectly for Albemarle that which the constitution forbids Albemarle to do for itself, that is, to issue tax-free revenue bonds to finance construction of an integral part of its plant. The cost of such construction is just one of the many expenses which a manufacturing enterprise must take into account in fixing the price of its product.

The conclusion is inescapable that Albemarle is the only direct beneficiary of the tax-exempt revenue bonds which the Halifax and Northampton Authorities propose to issue and that the benefit to the public is only incidental or secondary. It cannot be said that a benefit results to the public when the State assists a private industry in financing facilities the law requires the industry to construct without such aid. *See Price v. Philadelphia Parking Authority, supra.* This is especially true when, as here, the industry is able to do its own financing. Opinion of the Justices, 359 Mass. ____, 268 N.E. 2d 149 (1971).

Were the State to aid Albemarle by tax-free revenue bond financing, to that extent it would subsidize a particular pulp and

paper mill which is in competition with other and unsubsidized pulp and paper mills, a violation of N.C. Const. art. V, § 2(1). We take judicial notice that competing pulp and paper mills are located in different counties in widely separated parts of this State. Under the Act the governing body of a county creates a Pollution Abatement and Industrial Facilities Financing Authority in the exercise of its own discretion. Obviously, therefore, the Act does not purport to give any assurance that all competing private industries (taxpayers in the same classification) would receive the same benefits from the Act. Moreover, once any industrial polluter receives the subsidy provided by tax-free revenue bond financing, all others—chemical producers, iron and steel mills, petroleum refineries, smelters, energy producing utilities, et cetera—would be equally entitled to the same subsidy. Incidentally, it can reasonably be anticipated that, were all their demands to be met, industrial revenue bonds would flood the bond market to the detriment of old fashioned municipal bonds backed by the full faith and credit of the municipality seeking to finance schools, sewerage disposal systems, fire equipment and other public ventures.

Pollution control facilities are single-purpose facilities, useful only to the industry for which they would be acquired and to which they would be leased. If that industry were to become insolvent or, for any reason, default in its rental payments and guarantee of the bonds which an authority had issued to finance the facilities, those bonds would soon be in default. A few such defaults would certainly adversely affect the revenue-bond market and, almost certainly, also the credit rating of the county whose governing body had created the defaulting authority. These economic dangers demonstrate the wisdom of N. C. Const. art. V, § 2(1).

The only benefit which could inure to the public from State aid to an industry under mandate to abate its pollution would be the general benefit to the community's economy from the retention of the industry in the event the industry was unable or unwilling to comply with the State's mandate without State aid, and the alternative was to cease operations. Undeniably the consequences of any wholesale lay-off or substantial unemployment for whatever cause is detrimental to a community.

The arguments for and against State aid to private industry for the purpose of attracting or retaining it in the State, and the question whether such aid was for a public purpose, were

both fully examined and considered in *Mitchell v. Financing Authority, supra.* Notwithstanding its recognition that every legitimate business in a community promotes the public good, this Court held in *Mitchell* that the function of the Industrial Development Financing Authority, to acquire sites and to construct and equip facilities for private industry by the issuance of revenue bonds, was not for a public purpose and the expenditure of tax funds appropriated to enable the Financing Authority to commence operation was not constitutionally permissible. By the same token State aid to a private industry in the form of tax-exempt revenue bond financing is equally unconstitutional.

The basic facts in each of the three cases which we now consider raise the same question of public purpose which we decided in *Mitchell v. Financing Authority.* In cases Nos. 80 and 81, the Halifax and Northampton Authorities seek to aid Albemarle, an established industry, in financing the pollution control and abatement facilities which the law is requiring it to install to continue operations; in case No. 82, the Jones Authority seeks to acquire a new industry by financing for Albemarle the construction of a dimension lumber mill. In these three cases the Halifax, Northampton, and Jones Authorities seek—as did the Financing Authority under the Mitchell Enactment—to promote the economic welfare and increase the resources of their respective areas by direct aid to private industry.

In our view restricting State aid to private industry (1) to financing pollution control facilities in any area and (2) to constructing industrial facilities in counties which are distressed areas as defined by G.S. 159A-3(6a) does not differentiate the purpose of the Act from that of the Industrial Financing Act, which we held unconstitutional in *Mitchell v. Financing Authority.* As heretofore pointed out, the cost of financing pollution abatement and control facilities is merely a part of the expense of plant construction. In *Mitchell v. Financing Authority, supra,* and in *Foster v. Medical Care Comm., supra,* we held (1) that direct State aid to a private enterprise for plant and hospital construction is not for a public purpose, and (2) that the stimulation of a depressed economy cannot be accomplished, or attempted, by direct State aid to a private industry, even though incidental benefits result to the area from such assistance. The Act's specifications for "distressed areas" does not take these cases out of the *Mitchell* rationale. *See Mitchell v. Financing Authority, supra* at 156-157, 159 S.E. 2d at 758-759.

**[16]** Since the State may not directly aid a private industry by the exemption of its bonds for plant construction from taxation, it may not indirectly accomplish the same purpose by authorizing the creation of an authority to issue its tax-exempt revenue bonds for that same purpose. We hold, therefore, that the creation of the Halifax, Northampton, and Jones County Authorities for the purpose of financing pollution abatement and control facilities or industrial facilities for private industry by the issuance of tax-exempt revenue bonds is not for a public purpose and that the Act which purports to authorize such financing violates N. C. Const. art. V, § 2(1). This ruling makes it unnecessary to decide whether the Act violates any other provisions of the Constitution or to consider petitioners' appeal in case No. 82.

In cases Nos. 80 and 81 the judgments of the court below are reversed, and the cases are remanded to the Superior Court of Wake County for entry of judgment in accordance with plaintiff's prayer for relief. In case No. 82 the judgment of the court is affirmed.

Cases Nos. 80 and 81, reversed and remanded.

Case No. 82, affirmed.